**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 14 2012, 8:47 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**IAN O'KEEFE**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| NICHOLAS CORBIN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 79A02-1202-CR-161 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE TIPPECANOE CIRCUIT COURT
The Honorable Donald L. Daniel, Judge
Cause No. 79C01-1109-FB-16

**December 14, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

Nicholas Corbin appeals his convictions for burglary, as a Class B felony; burglary, as a Class C felony; attempted burglary, as a Class C felony; theft, as a Class D felony; auto theft, as a Class D felony; resisting law enforcement, as a Class D felony; resisting law enforcement, as a Class A misdemeanor; three counts of receiving stolen property, each as a Class D felony; and criminal mischief, as a Class B misdemeanor, following a jury trial. Corbin also appeals his sentence. On appeal, Corbin raises the following three issues for our review:

1.  Whether the prosecutor committed misconduct when he noted the defense's lack of evidence in his closing statement.

2.  Whether the State presented sufficient evidence to support each of Corbin's convictions.

3.  Whether Corbin's thirty-year aggregate sentence is inappropriate in light of the nature of the offenses and his character.

We affirm.

**FACTS AND PROCEDURAL HISTORY**

In the early morning hours of August 22, 2011, the Lafayette Police Department received multiple reports of car break-ins. Officer Kevin Miller responded to the area of the break-ins and observed Corbin walking south on 9th Street with a backpack. When Corbin saw Officer Miller, he turned and ran. Officer Miller pursued Corbin and called for backup. Less than five minutes later, the officers apprehended Corbin, but he no longer had the backpack on. Officer Miller released Corbin because no crime report had been filed.

Thereafter, the officers located the backpack on top of a nearby wooden shed. Inside the backpack, officers discovered wallets, jewelry, iPods, cell phones, digital cameras, and other items. Some of the items matched property that had been removed from vehicles owned by Julie Leming and Dawn Morehouse, and those items were returned to their owners.

In the evening of September 9, Chris Widner met with Corbin at the home of Penny Edwards and Michael Byse. Corbin told Widner that Corbin's girlfriend had been attacked and raped, and that he needed Widner's help. Widner agreed to help, and around 3:00 a.m. Byse drove the two men to the American Legion Post 492 ("Post 492"). Although Corbin did not know where they were heading when they left, Byse knew that Corbin intended to burgle Post 492 because Corbin promised Byse some of the stolen money. Corbin further told Byse that "he was going to go through the roof," which struck Byse as odd. Transcript Vol. II at 110. Byse dropped Corbin and Widner off about a half-mile from Post 492.

At Post 492, Corbin told Widner "to keep [an] eye out while we try to rob the American Legion." Id. at 188. Corbin then climbed onto a freezer outside the building and tried to cut through the soffit. At some point, Corbin told Widner that he had used the same method to break into the American Legion Post 11 on 9th Street ("Post 11"), where Corbin had successfully stolen about $1000, along with some alcohol. The State would later show the jury Post 11's surveillance video from August 29th that showed an unidentified man breaking into the Post using this method and carrying a pack the same

3

size as the one Corbin used when he tried to enter Post 492. Corbin had done some contractor work on Post 11 prior to the unauthorized entry, working on the attic and roof.

But Post 492 had wood underneath its soffits, which prohibited Corbin's entry. As such, Corbin instead tried to access the building through a window near an air conditioning unit. During the course of this attempt, Corbin left a footprint on the air conditioning unit. When his attempt to enter the building failed, Corbin tried to access the building through a shed, which he pried open. The shed, however, did not have access to the interior of the building. Corbin and Widner left shortly thereafter.

Corbin and Widner instead broke into a number of nearby vehicles. They removed medicine from a 1994 Ford Ranger belonging to Monty Martin. They removed two knives and some money from a 2000 Dodge Dakota Cab belonging to Fred Chafin. They then walked back to where Byse had dropped them off and discarded their tools into the nearby woods. They then stole Randy Cochran's wallet from either his GMC Jimmy or his Dodge Stratus, both of which they had broken into.

Corbin and Widner proceeded into the Sheridan Woods neighborhood, which had only one way in and out. The two men entered the garage of the home of Jane Ausman-Mudawar, which set off her home alarm. Undeterred, Jane shut off the alarm and turned on her outside lights, which allowed her to observe two men running away from her garage. Jane called the police.

After fleeing Jane's house, Corbin and Widner broke into a Ford F-150 belonging to John Brenan in Sheridan Woods. Corbin found the truck's keys inside, and he gave the keys to Widner, who proceeded to drive the truck out of the neighborhood.

4

By this time, however, two Tippecanoe Sheriff's deputies had arrived in response to Jane's call. Deputy Robert Hainje and his K-9 searched the neighborhood while Deputy Jason Freeman waited at the neighborhood's only point of entry. Around 5:00 a.m., Deputy Freeman observed Brenan's F-150 drive past him. Deputy Freeman followed the truck, and he then observed the truck accelerate to ninety miles per hour. Deputy Freeman activated his lights and pursued the vehicle to the intersection of Grant Street and Stadium Avenue. There, Corbin and Widner exited the truck and fled on foot.

Rather than pursuing the two men alone, Deputy Freeman waited for Deputy Hainje and his K-9 unit to arrive. The officers found Widner hiding under a nearby deck shortly thereafter. The K-9 unit further alerted the officers to a nearby black Fiero, but the officers did not observe anyone inside that vehicle. And inside the F-150, the officers discovered Cochran's wallet and Martin's prescription drugs.

Byse saw Corbin later that morning. Corbin told Byse "that he was involved in a high speed pursuit," that "he jumped out of the truck and let Chris go," and that "[h]e hid in a parked car . . . like a Fiero." Id. at 114. That same morning, Corbin also told Edwards that he had fled from the police with Widner and "got into the bottom of the car, Fiero or whatever kind of car it [wa]s, [and] waited for the cops to leave . . . ." Id. at 144.

After his arrest, Widner told the police where they could find Corbin's tools and duffel bag that they had discarded in the woods near Post 492. Tippecanoe Sheriff's Detective Robert Goldsmith went to the location described by Widner and found the items, which included the tin snips Corbin had used to cut Post 492's soffits and a pry bar.

On September 15, the State charged Corbin with the following nine counts: (1) burglary, as a Class B felony; (2) burglary, as a Class C felony; (3) theft, as a Class D felony; (4) resisting law enforcement, as a Class D felony; (5) auto theft, as a Class D felony; (6) resisting law enforcement, as a Class A misdemeanor; (7) receiving stolen property, as a Class D felony; (8) receiving stolen property, as a Class D felony; and (9) receiving stolen property, as a Class D felony. Thereafter, the State amended its information to include the following additional counts: (10) attempted burglary, as a Class C felony; (11) theft, as a Class D felony; (12) criminal mischief, as a Class B misdemeanor; and (13) theft, as a Class D felony.

The trial court held Corbin's jury trial between January 10 and January 12, 2012. Byse, Edwards, Widner, the various victims, and several officers all testified on behalf of the State. Corbin did not present any evidence in his defense. Following the trial, the jury found Corbin guilty on Counts 1 through 10 and Count 12. The court entered its judgment of conviction and, thereafter, sentenced Corbin to an aggregate term of thirty years executed. This appeal ensued.

**DISCUSSION AND DECISION**

**Issue One: Prosecutorial Misconduct**

Corbin first asserts that the prosecutor committed fundamental error[1] when he allegedly commented, during his closing statement, on Corbin's refusal to testify in his own defense. As our supreme court has explained:

---

[1] Corbin acknowledges that the fundamental error doctrine applies to this issue since his trial counsel did not object during the prosecutor's closing statement.

6

A claim that has been waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred. See, e.g., Trice v. State, 766 N.E.2d 1180, 1182 (Ind. 2002); Hayworth v. State, 904 N.E.2d 684, 694 (Ind. Ct. App. 2009). The fundamental error exception is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." Mathews v. State, 849 N.E.2d 578, 587 (Ind. 2006). The error claimed must either "make a fair trial impossible" or constitute "clearly blatant violations of basic and elementary principles of due process." Clark v. State, 915 N.E.2d 126, 131 (Ind. 2009). This exception is available only in "egregious circumstances." Brown v. State, 799 N.E.2d 1064, 1068 (Ind. 2003).

This doctrine has been applied, for example, to review a conviction without proof of an element of the crime despite the lack of objection. Smith v. State, 459 N.E.2d 355, 357 (Ind. 1984). . . .

Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010).

Here, Corbin asserts that the prosecutor's closing statement "indirectly . . . comment[ed] upon the failure of the defendant to testify." Appellant's Br. at 16. Specifically, Corbin complains about the following two comments made by the prosecutor: "A second point you heard no evidence, no testimony that ever directly contradicted any of these material details," Supplemental Transcript at 25; and "where is Red in those conversations? Was he ever mentioned? Has he [Corbin] ever come up in a single shred of evidence? He could be the other guy in the video that you saw from Post 11[,] it's possible. But there was no evidence suggesting he was," id. at 42.

The prosecutor's comments were not fundamental error but were, rather, permissible comments on the uncontradicted nature of the State's evidence. As our supreme court has explained:

7

The Fifth Amendment privilege against self-incrimination is violated "when a prosecutor makes a statement that is subject to reasonable interpretation by a jury as an invitation to draw an adverse inference from a defendant's silence." Moore v. State, 669 N.E.2d 733, 739 (Ind. 1996). However, statements by the prosecutor concerning the uncontradicted nature of the State's evidence do not violate the defendant's Fifth Amendment rights. Martinez v. State, 549 N.E.2d 1026, 1028 (Ind. 1990). Rather, comment on the lack of defense evidence is proper so long as the State focuses on the absence of any evidence to contradict the State's evidence and not on the accused's failure to testify. Id.; see also Timberlake v. State, 690 N.E.2d 243, 254 (Ind. 1997) (observing "[d]uring argument, the prosecutor may argue and comment upon the evidence presented at trial. . . . A comment based upon uncontradicted evidence is not equivalent to an impermissible comment upon a defendant's decision not to testify").

Dumas v. State, 803 N.E.2d 1113, 1118 (Ind. 2004). Here, the prosecutor's closing statements focused only on the absence of any evidence to contradict the State's evidence. The prosecutor did not address Corbin's failure to testify, explicitly or implicitly, and nothing in his closing remarks is subject to a reasonable interpretation that the jury was being asked to draw an adverse inference from Corbin's silence. As such, this argument is without merit.

**Issue Two: Sufficient Evidence**

Corbin next asserts that the State failed to present sufficient evidence to support each of his convictions. When reviewing a claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. Jones v. State, 783 N.E.2d 1132, 1139 (Ind. 2003). We look only to the probative evidence supporting the verdict and the reasonable inferences that may be drawn from that evidence to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a

8

reasonable doubt.  Id.  If there is substantial evidence of probative value to support the conviction, it will not be set aside.  Id.

Though Corbin addresses each of his convictions individually, much of his argument is premised on his assertion that Widner's testimony against him is incredibly dubious.  Our supreme court has explained the incredible dubiosity rule as follows:

> Within the narrow limits of the "incredible dubiosity" rule, a court may impinge upon a jury's function to judge the credibility of a witness.  If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed.  This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity.  Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

Love v. State, 761 N.E.2d 806, 810 (Ind. 2002) (citations omitted).

The incredible dubiosity rule does not apply to Widner's testimony.  Widner was not a "sole witness," and his testimony was not "inherently improbable . . . or coerced, equivocal, [or] wholly uncorroborated."  Id.  Indeed, Widner's testimony was corroborated by several other witnesses and exhibits.  For example, Jane's testimony corroborated Widner's with respect to Count 1; the security video from Post 11 corroborated Widner's testimony with respect to Count 2 and Count 3; Deputy Freeman's testimony corroborated Widner's with respect to Count 4; Edwards' and Byse's testimony corroborated Widner's with respect to Count 5, Count 6, Count 9, and Count 10.  Further, the State corroborated Widner's account of the Post 492 break-in when it admitted Corbin's tools into evidence, which were discovered based on Widner's

9

description, which corroborated Widner's testimony with respect to Count 12. And insofar as Widner's prior statements to police may have differed from his actual trial testimony, those statements were admitted to the jury for it to consider in determining Widner's credibility, which we will not reconsider on appeal.

Corbin also challenges the sufficiency of the State's evidence for Count 7 and Count 8, both of which alleged that Corbin had received stolen property on August 22. But Corbin's only argument on these two counts is to cast doubt on the observations of Officer Miller. Officer Miller testified that he responded to a report of several automobile break-ins early that morning, that he saw Corbin in the vicinity with a backpack, that Corbin immediately fled from him, and that, when he and other officers caught up with Corbin, Corbin no longer had the backpack. Officer Miller then testified that he later found the backpack and that, inside it, he found property belonging to, among others, Leming (Count 7) and Morehouse (Count 8). Thus, the State presented sufficient evidence to support these two convictions as well, and Corbin's argument on appeal is merely a request for this court to reweigh the evidence, which we will not do.

**Issue Three:  Sentencing**

Finally, Corbin asserts that his thirty-year aggregate sentence is inappropriate. Although a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Sections 4 and 6 of the Indiana Constitution "authorize[] independent appellate review and revision of a sentence imposed by the trial court." Roush v. State, 875 N.E.2d 801, 812 (Ind. Ct. App. 2007) (alteration original). This appellate authority is implemented through Indiana Appellate Rule 7(B). Id. Revision of

a sentence under Appellate Rule 7(B) requires the appellant to demonstrate that his sentence is inappropriate in light of the nature of his offense and her character.  See Ind. Appellate Rule 7(B); Rutherford v. State, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007).  We assess the trial court's recognition or non-recognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate.  Gibson v. State, 856 N.E.2d 142, 147 (Ind. Ct. App. 2006).  However, "a defendant must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review."  Roush, 875 N.E.2d at 812 (alteration original).

Moreover, "sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference."  Cardwell v. State, 895 N.E.2d 1219, 1222 (Ind. 2008).  Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented.  See id. at 1224.  The principal role of appellate review is to attempt to "leaven the outliers."  Id. at 1225.  Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case."  Id. at 1224.

Here, the trial court found the following mitigating and aggravating factors:

> The Court finds as mitigating factors that the defendant suffers from mental health issues, incarceration of the defendant will result in undue hardship on his dependent, and the defendant served in the United States military.
> The Court finds as aggravating factors the defendant has a history of criminal or delinquent activity, the defendant has a history of illegal drug and alcohol use, the defendant has not taken responsibility for his crime, the defendant has no employment history, and the defendant was on probation at the time of the instant offense.

11

Appellant's App. at 37.

On appeal, Corbin focuses his argument on the sentence resulting from four of his convictions, namely, his convictions for Count 1, Count 2, Count 3, and Count 4. But this piecemeal analysis is contrary to our review under Appellate Rule 7(B). As our Supreme Court has held: "appellate review should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." Cardwell, 895 N.E.2d at 1225.

Corbin's aggregate term of thirty years executed is not inappropriate based on the nature of the offenses. When multiple victims are involved, "enhanced and consecutive sentences seem necessary to vindicate the fact that there were separate harms and separate acts against more than one person." Serino v. State, 798 N.E.2d 852, 857 (Ind. 2003). Corbin was convicted of eleven crimes that included multiple victims, including Jane, Post 11 and its members, Post 492 and its members, Brenan, Leming, Morehouse, and Cochran. Further, Corbin's crimes extended over several weeks, and he faced a maximum possible sentence of fifty-five years.[2] We cannot say his thirty-year sentence is inappropriate based on the nature of the offenses.

Neither is Corbin's sentence inappropriate in light of his character. Corbin has a lengthy criminal history, with two prior felony convictions for theft, a prior felony conviction for burglary, a prior misdemeanor conviction for resisting law enforcement, and two prior misdemeanor convictions for driving with a suspended license. Corbin was

---

[2] This does not include the maximum term of incarceration of 180 days for the Class B misdemeanor conviction. See Ind. Code § 35-50-3-3.

12

also adjudicated a delinquent for possession of stolen property. He has had six petitions to revoke probation filed against him. Three were found true and three were pending at the time he was sentenced for the instant offenses. Corbin's extensive criminal history, especially relating to property crimes, and the repeated violation of his probation reflect poorly on his character. Accordingly, we cannot say that his sentence is inappropriate.

## CONCLUSION

In sum, the prosecutor did not commit fundamental error during his closing statements. The State presented sufficient evidence to support each of Corbin's convictions. And Corbin's thirty-year aggregate sentence is not inappropriate in light of the nature of the offenses or Corbin's character. Thus, we affirm Corbin's convictions and sentence.

Affirmed.

FRIEDLANDER, J., and BRADFORD, J., concur.