**Jerry JONES, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 49S00–0106–CR–00317.

Supreme Court of Indiana.

March 5, 2003.

Janice L. Stevens, Marion County Public Defender Agency, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General of Indiana, Office of the Attorney General Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

A trial court found Jerry Jones guilty of murdering a pawn shop owner and sentenced him to life without the possibility of parole. He now appeals, arguing that the trial court erred when it dismissed his motion to suppress evidence obtained during a search and seizure, allowed him to

represent himself *pro se,* and convicted him based on insufficient evidence. We affirm.

### Facts and Procedural History

The investigation of the murder became intertwined with that of an earlier bank robbery. On the morning of September 3, 1997, there was a bank robbery in Chesterfield. Police pursued the suspected robbers in a car until the car crossed several lanes and landed in a ditch. The three occupants exited the car and fled into a nearby field. Police searched the car, registered to Gregory Jones ("Greg"), and found Greg's Indiana drivers license and Department of Correction identification card; they also found an Indiana identification card for Jerry Jones ("Jones"). The car's trunk contained a garbage bag filled with money from the bank.

The police learned that Greg's relative J.P. also worked for the Department of Correction, and they conducted a residential surveillance of all three suspects.[1] Officers apprehended J.P. but later eliminated him as a suspect because his size and stature were inconsistent with the description of the robbers. The investigation of Greg and Jones continued.

As for the pawn shop, Ron Conner ("Conner") owned and operated the Lawrence Gold and Coin Shop at 8160 Pendleton Pike in Lawrence, Marion County. On the morning of August 13, 1997, a worker in an adjacent shop looked through the window in the side of the building, noticed the owner's leg lying behind the counter, and immediately called for assistance. Police took fingerprints at the shop and also collected a spent cartridge casing and a .32 caliber cartridge.

Detective Don Deputy of the Lawrence police conducted the initial homicide investigation. Conner's son informed the police that there were several valuables missing from the display case, including a Masonic ring and a ladies cluster ring. He also said that fold-over tags were attached to a substantial amount of the missing jewelry.

On September 4, 1997, the Lawrence police sought a warrant to search Greg's apartment for three suspects and items related to the bank robbery. A Madison county judge issued the warrant for Greg's apartment, at 3663 Governours Court, Apt. A in the Wingate Village apartment complex. The police watched the Governours Court address periodically while the initial search warrant was obtained.

Shortly after the police obtained the warrant, the Emergency Response Team entered Greg's apartment to look for the suspects, but the house was empty. The Emergency Response Team discovered a weapon under the bed and placed it on the bed.

Thereafter, the police entered the apartment to search for additional weapons and other items connected with the bank robbery. While searching, they discovered additional guns and ammunition. One officer noticed several rings in a display case with white tags attached to them. The rings were later connected to the robbery and murder of Conner, the pawn shop owner. An officer conducting the bank robbery investigation informed the Lawrence police about the tray of rings they saw during the initial search. This officer

---

1. The residential surveillance included the Governours Court residence as the primary residence for Greg, Venice Court as the primary residence for J.P., and a home on the northwest side of town as the primary residence for Jones. (T.R. 640–45.) The police focused surveillance on the Governours Court address after receiving a tip that the suspects were in the area. J.P. also informed police that Jerry would sometimes reside at Greg's apartment. (T.R. 682–83.)

knew that the Lawrence police were investigating a pawn shop crime.

Subsequently, the Lawrence police obtained a second warrant for the Governours Court residence to search for weapons and evidence connected to the pawn shop offense. An officer familiar with several of the missing rings identified some of the items in Greg's apartment. A casing collected at the pawn shop contained similar characteristics as those fired from the handgun found in the apartment.

The police obtained yet a third warrant seizing additional contraband related to the pawn shop robbery and murder, and they seized the jewelry, a .32 caliber Lorcin gun, various papers, and other items.

On September 8, after Jones denied that he had ever been in the store, Detective Don Deputy informed Jones that his prints were identified in the Lawrence Gold and Coin Shop. Police found Jones' fingerprints on a ring tray in the rear of the shop, and his palm print on a display case.

Jones waived trial by jury and in due course the trial court concluded beyond a reasonable doubt that Jones was a major participant in the robbery and murder of Conner at the Lawrence Gold and Coin. Furthermore, the court found that Jones intentionally killed Conner and sentenced Jones to life without parole.

## I. Illegal Search and Seizure

After denying Jones' motion to suppress, the trial court admitted into evidence the tray of jewelry and .32 caliber Lorcin, found at the Governours Court address. Jones claims the warrant authorizing the search was illegally obtained.

■ In asserting such claims, we focus on whether a "substantial basis" existed for a warrant authorizing a search or seizure. *Houser v. State*, 678 N.E.2d 95 (Ind.1997). Where a presumption of the validity of the search warrant exists, the burden is upon the defendant to overturn that presumption. *Snyder v. State*, 460 N.E.2d 522 (Ind.Ct.App.1984). If the evidence is conflicting, we consider only the evidence favorable to the ruling and will affirm if the ruling is supported by substantial evidence of probative value. *Melton v. State*, 705 N.E.2d 564 (Ind.Ct.App. 1999).

■ Jones argues that the first warrant was invalid because the police officer failed to inform the issuing judge that the Governours Court apartment was under surveillance. A warrant is not invalid simply because it contains slightly inaccurate material that is immaterial to the warrant's validity.

In *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the U.S. Supreme Court held that a warrant is invalid where the defendant can show by a preponderance of the evidence that the affidavits used to obtain the warrant contain perjury by the affiant, or a reckless disregard for the truth by him, and the rest of the affidavit does not contain materials sufficient to constitute probable cause. *See Id.* at 171–72, 98 S.Ct. 2674. Furthermore, fruits of the search will be excluded just as if the affidavit did not contain allegations sufficient to constitute probable cause. *Id.*, at 155, 98 S.Ct. 2674.

In this case, however, the officer who obtained the initial search warrant hardly committed perjury to obtain the warrant, nor did he display a reckless disregard by failing to inform the judge of the surveillance during the probable cause hearing. As we observed in *Taylor v. State*, 659 N.E.2d 535, 539 (Ind.1995), probable cause requires only that the information available to the officer would lead a person of reasonable caution to believe the items could be useful as evidence of a crime.

Based on the descriptions of the suspects and the identification discovered in the car, probable cause existed to issue a search warrant for the Governours Court address.

Jones also argues that there is no substantial basis to support a finding of probable cause because the first warrant obtained applied only to the seizure of the three persons, and any items discovered as a result of the search are invalid as fruits of the unlawful search. We disagree.

It is true that the warrant specifically directs the police to search and seize the three suspects whom police believed were at the Governours Court address, but the warrant also grants a search of the entire premises. Furthermore, the warrant indicates that "probable cause exists to believe that the items seized were located at the Governours Court address. These include the goods, chattels, items or any part ... described and found as a result of the law enforcement agency whose officer executes the search warrant ..." (Appellant's Exhibit C.) Thus, to search and seize any person or item that the police believed was connected with the bank robbery did not exceed the scope of the initial warrant or invalidate it.

■ **Plain View Doctrine and Subsequent Warrants.** Jones petitioned the court to suppress the jewelry, asserting that a warrantless search and seizure occurred when the police moved trays of jewelry and placed them on the bed, and arguing that the plain view doctrine did not apply.

■ Police may seize evidence not identified in a warrant under the plain view doctrine. The plain view doctrine allows a police officer to seize items when he inadvertently discovers items of readily apparent criminality while rightfully occupying a particular location. *Garrett v. State,* 466 N.E.2d 8 (Ind.1984.) *See Cool-idge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). First, the initial intrusion must have been authorized under the Fourth Amendment. *Daniels v. State,* 683 N.E.2d 557, 558 (Ind. 1997.) Second, the items must be in plain view. *Id.* Finally, the incriminating nature of the evidence must be immediately apparent. *Id.*

In *Arizona v. Hicks,* 480 U.S. 321, 324–25, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), the Supreme Court ruled the police conducted a warrantless search when they moved a stereo to collect the serial numbers that were on the backside of the equipment. The present case differs from *Hicks* because the police did not move the jewelry to collect additional information. The fold-over tags on the jewelry in the display case were visible without any movement. The police did not acquire any additional information or benefit that they could not see before they moved the jewelry tray.

Moreover, the police obtained a subsequent search warrant. Had the police relied solely on the first warrant to seize the jewelry, perhaps the outcome would be different. Nevertheless, the jewelry was in plain view during the initial search. The police obtained a second warrant, which included additional facts to justify probable cause to seize the jewelry. We think this sequence of events is consistent with the plain view doctrine.

Jones further argues that the gun was not included in the search warrant. Seizure of the .32 caliber handgun is integrated into the "other evidence of the crime" segment of the search warrant. Conner was shot during the robbery at close range. It is reasonable to infer that a gun would likely be seized as a natural extension of "other evidence of the crime" for a homicide and robbery.

The trial court properly admitted the evidence.

## II. Waiver of Counsel

■ Jones suggests that the trial court allowed him to represent himself without satisfactorily advising him of the dangers of self-representation.

■ The Sixth Amendment to the U.S. Constitution and Article 1, section 13 of the Indiana Constitution guarantee a criminal defendant the right to appointed counsel. *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Callahan v. State,* 719 N.E.2d 430, 439 (Ind.Ct.App.1999). Accordingly, when a criminal defendant waives his right to counsel and elects to proceed *pro se,* we must decide whether the trial court properly determined that the defendant's waiver was knowing, intelligent, and voluntary. *Greer v. State,* 690 N.E.2d 1214, 1216 (Ind. Ct.App.1998), *trans. denied.*[2] Waiver of assistance of counsel may be established based upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *Jackson v. State,* 441 N.E.2d 29, 32 (Ind.Ct.App.1982.)

In *Dowell v. State,* 557 N.E.2d 1063 (Ind.Ct.App.1990), the Court of Appeals suggested several guidelines for a court to advise the defendant when he considers self-representation. The guidelines include:

(1) The defendant should know the nature of the charges against him, the possibility that there may be lesser included offenses, and the possibility of the defenses and mitigating circumstances; (2) the defendant should be aware that self representation is almost always unwise, that he may conduct a defense which is to his own detriment, that he will receive no special treatment from the court and will have to abide by the same standards as an attorney, and that the State will be represented by experienced legal counsel; (3) the defendant should be instructed that an attorney has skills and expertise in preparing for and presenting a proper defense; and (4) the trial court should inquire into the defendant's educational background, familiarity with legal procedures and rules of evidence and mental capacity.

*Id.,* 557 N.E.2d at 1066–67.

Although this Court has endorsed these guidelines, we held in *Leonard v. State,* 579 N.E.2d 1294, 1296 (Ind.1991) that the guidelines do not "constitute a rigid mandate setting forth specific inquiries that a trial court is required to make before determining whether a defendant's waiver of right to counsel is knowing, intelligent, and voluntary." Accordingly, we noted it is sufficient for the lower court to acquaint the defendant with the advantages to attorney representation and the drawbacks of self-representation. *Id.*

In *Faretta,* the U.S. Supreme Court mandated that a record of waiver be established and also advised that the *pro se* defendant should be told about the dangers and disadvantages of self-representation. *Dowell,* 557 N.E.2d at 1066. We recently re-emphasized the importance of such warnings. *See Poynter v. State,* 749 N.E.2d 1122, 1129 (Ind.2001) (new trial ordered where judge did not advise defendant about dangers of self-representation).

The record here demonstrates that the trial court questioned Jones and his counsel several times to establish whether Jones knowingly, willingly, and voluntarily

**2.** The right to counsel can only be relinquished by a knowing, voluntary, and intelligent waiver of the right. *Russell v. State,* 270 Ind. 55, 383 N.E.2d 309, 312 (1978); *McKeown v. State,* 556 N.E.2d 3, 6 (Ind.Ct. App.1990) (citations omitted).

exercised his right to self-representation. (*See* Appendix 458, 514; T.R. 59–63).

The court explicitly informed Jones regarding the potential danger of *pro se* litigation.[3] The judge reminded Jones that he was not trained in the law and that his attorneys were. (T.R. at 59.) It cautioned him that he would be held to the same standard as a lawyer "as far as the rules of evidence and arguments go. I'm not going to cut you any slack in this regard." (T.R. at 60.) It warned him that if he were convicted he would not be able to claim ineffective assistance on appeal. (T.R. at 62.)

The court asked Jones more than three times whether he wanted to represent himself and Jones said he did. Jones acknowledged that he realized he would be held to the same standard as an attorney. The court attempted to discourage Jones from self-representation: "I advise you [Jones] I don't think it's a good idea.... If I was charged with this, I wouldn't want to represent myself." (T.R. at 60.) Finally, the appointed attorneys for Jones indicated that each had discussed the matter with Jones, and both of them told the court they believed Jones understood what his decision involved. (T.R. at 62–63.)[4]

The court's inquiry and the responses were adequate to establish that Jones exercised his right to represent himself *pro se* knowingly, willingly, and voluntarily.

## III. Sufficiency of Evidence on Intentionality

Jones contends the State failed to prove an intentional killing, a necessary finding for sentencing to life without the possibility of parole.

When reviewing the claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Jordan v. State,* 656 N.E.2d 816 (Ind.1995), *reh'g denied.* We look only to the probative evidence supporting the verdict and the reasonable inferences therein to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Fields v. State,* 679 N.E.2d 898 (Ind.1997). If there is substantial evidence of probative value to support the conviction, it will not be set aside. *Id.*

Moreover, it is well settled that a conviction for murder may be sustained on circumstantial evidence. *Green v. State,* 587 N.E.2d 1314 (Ind.1992). If a reasonable inference can be drawn from the circumstantial evidence, the verdict will not be disturbed. *Id.* Furthermore, intent to kill may be inferred where evidence establishes that the mortal wound was inflicted upon the victim by a deadly weapon in the hands of the defendant. *Landress v. State,* 600 N.E.2d 938 (Ind. 1992).

The circumstantial evidence directs us towards Jones. Police found the murder

---

3. The court's inquiry regarding whether Jones knowingly, willingly, and voluntarily wanted to represent himself *pro se* is reflected in the trial record pp. 58–64.

4. Such moments present judges with a potential "Catch 22." Though the judge must ensure that a defendant acts in a knowing, intelligent, and voluntary manner, he cannot coerce him to change his mind about *pro se* representation. Jones has an absolute right to represent himself *pro se*, regardless of whether his representation equates to the quality of his court appointed attorneys. In *Sherwood v. State,* 717 N.E.2d 131, 134 (Ind. 1999), we observed that "respect for the individual, which is the life blood of the law, requires that the accused's choice be honored although he may conduct his own defense to his detriment." *Id.* quoting *Faretta,* 422 U.S. at 834, 95 S.Ct. 2525 (1975).

weapon, .32 caliber Lorcin, under a pile of clothing in the room in the apartment where Jones kept his belongings. (T.R. at 289–90.) It was the gun that fired the fatal bullet. (T.R. 514–17.) Jones' fingerprints were located in the store on the ring tray that was in the rear of the store, where presumably few customers had access. A display case at the pawn shop contained Jones' palm print, yet Jones denies ever entering the store.

Jones complains that the court found an intentional killing based on its conclusion that the victim was shot from behind while bending over, execution-style, the court said. Actually, the bullet entered the victim's neck from the side and traveled slightly upward, never entering the skull.

Thus, says Jones, the court's finding of intentionality rests on an inference that is solely based on another inference, contrary to our decision in the capital case of *Landress*. 600 N.E.2d at 942.

This puts too fine a point on the matter. While the trial court's description of the killing may not have fit precisely with the stipulated coroner's report, the agreed fact that Conner was shot behind and below the ear at intermediate range was sufficient to support the court's finding of intentional killing.

### IV. Conclusion

We affirm the trial court's judgment.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.