## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 29 2016, 8:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David M. Payne
Ryan & Payne
Marion, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Alva Oliver Funk,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

December 29, 2016

Court of Appeals Case No.
27A02-1601-CR-170

Appeal from the Grant Superior
Court 1

The Honorable Jeffrey D. Todd,
Judge

Trial Court Cause No.
27D01-1305-FC-26

**Mathias, Judge.**

[1]     In April 2013, a masked man robbed a bank in Marion, Indiana ("the April robbery"). A Grant County jury found that Alva Funk ("Funk") was behind the

mask. Funk was convicted in Grant Superior Court of one count of Class B felony robbery with a deadly weapon. The trial court sentenced Funk, then seventy-two years old, to fifty years in the Indiana Department of Correction.

[2] Funk now appeals, challenging the seizure of certain evidence from his home, the sufficiency of the evidence, and the State's closing argument at trial.

[3] We affirm.

## Facts and Procedural Posture

### *The April Robbery*

[4] On April 5, 2013, at around 11:00 A.M., an elderly looking man walked into a branch of STAR Financial Bank in Marion. He wore large, loose-fitting coveralls, a light-colored ball cap, and was barehanded. As he passed through the bank's vestibule and inner doors, one of the bank tellers then working noticed that the "elderly" man was wearing a mask in the form of an old man's face. The teller concluded she was about to be robbed.

[5] The masked man approached the teller's window and handed her a note with instructions to the following effect: "Do not trigger an alarm"; "give me your one hundreds, fifties, and twenties from [your] lower drawer and [your] top drawer"; "[I have] a weapon." Tr. p. 314. As the teller read the note, the man twice reached his right hand into the breast of his coveralls and then kept it there, hidden from the teller, until she complied. The teller handed the man all the money in her drawers. The man stuffed the money, almost $8,000, into a

Burger King paper bag, along with the note, and walked to the front doors. Near the doors, the man accidentally dropped a small, black piece of plastic on the ground.[1] He then left through the front doors as he had entered.

[6] The bank's surveillance cameras did not capture how the man arrived at, or departed from, the bank. In the minutes after the robbery, however, the surveillance cameras of a Walmart store down a side road from the bank captured footage of a small, black car traveling "relatively quickly" away from the bank. Tr. p. 513.

[7] Police soon arrived at the bank and began investigating. The dropped piece of plastic was recovered and submitted to the forensic scientists at the Indiana State Police lab in Indianapolis for DNA testing. The testing returned one complete, single-source DNA profile. That profile was checked against CODIS, the national index of DNA profiles maintained by the U.S. Department of Justice, where the profile was found to match that of a convicted felon currently on parole from a 1993 conviction for intimidation, resisting law enforcement, and criminal recklessness: Alva Funk of Lafayette, Indiana.

---

[1] At a probable cause hearing for a search warrant, the piece of plastic was identified by the lead investigator as a "piece of" or the "cap off of" an airsoft gun on the basis of "some markings on it." Ex. Vol. I, p. 16. This testimony, however, was never subjected to cross-examination and was never heard by the jury. *See infra* note 5.

### *The Search Warrant*

[8] On the basis of that match, and on the basis of other fruits of ongoing investigations into three other bank robberies committed under similar circumstances by similar means, including one in Marion in January 2013 ("the January robbery"), the Marion Police Department sought a search warrant from Judge Jeffrey Todd of Grant Superior Court for the home of Funk's sister and niece in Lafayette, where Funk was known to be living ("the Lafayette house"). The warrant was issued for the search and seizure of the following items:

> Old man style Halloween mask, green baseball style hat, dark colored baseball style hat, blue zipper style hooded sweatshirt, black shoulder strap bag, firearm or air-soft style handgun, ammunition, US Currency, US Currency that is marked bait money, two tone with inner lining dark zipper sweatshirt, 3x5 style index card bank robbery note, blue style baseball hat, gray or blue scarf, greenish colored zip up jacket with gray lining, blue jean pants, blue LEVI style baseball hat, boots, white tennis shoes, white or light color style beach hat, hair wigs, navy blue mechanic style jumpsuit overhauls [sic] with zipper, Burger King sack or bag, bank dye-pack and/or red stains, DNA standard and Major Case Finger/Palm Prints of Alva Oliver Funk DOB 6/01/1943[—which are l]ocated and concealed in . . . [the Lafayette house and the b]ody or person of [Funk] . . . .

Ex. Vol. I, p. 22.

[9] With the help of the Lafayette Police Department, the Marion Police Department executed the search warrant for the Lafayette house on April 26, 2013. Just as officers were preparing to enter the house, Funk was observed

driving away from it. Some distance away from the house, Funk was pulled over, arrested, and taken to a Lafayette police station for questioning. A swab of Funk's cheek was taken for the purposes of further DNA testing, and his cell phone was seized and examined.

[10] Back at the house, officers executed the search warrant in Funk's absence. Their search focused on an upstairs loft bedroom that Funk used as his own, as well as on a shared garage stocked with tools and other material, which Funk's grandnephew used as a base for his local construction business. Under the warrant, police recovered *inter alia* a set of dark-colored coveralls, a light-colored ball cap, a Burger King bag, and, from underneath Funk's mattress, a box of .38 Special ammunition with five rounds missing. From a detective of the Marion Police Department, the jury heard that this type of ammunition is "typically . . . associated" with a five- or six-round revolver. Tr. p. 673.

[11] In the course of their search, officers discovered what they believed to be incriminating items beyond those particularly described in the warrant. Wishing to seize those items as well, on-scene officers called the lead investigator and asked for direction. The lead investigator in turn called Judge Todd to ask for an "extension" of the search warrant to authorize seizure of the newly discovered items. A transcript of this conversation was apparently made but is not in the record before us.

[12] Judge Todd granted the investigators' request to extend the scope of the original search warrant. The second, "expanded" warrant does not appear in the record,

nor does the search warrant return listing all the items eventually seized.[2] However, the expanded warrant apparently authorized seizure of the following items: a handheld radio frequency scanner, a device described as a "cell phone jammer" inside a blue metal case, a laptop computer, a Chase Bank brochure with handwritten notes, and pieces of torn-up paper with handwritten notes.

[13] The pieces of torn-up paper were recovered from the bottom of a trashcan in the loft bedroom and pieced back together by on-scene officers as they searched for the robbery note. The torn-up pieces appeared to comprise two checklists: "note, glue ✓, mask . . . ✓, . . . bag ✓, gun ✓" and "jacket ✓, sweats, scanners ✓, . . . coveralls, cosmetic bag, jammer." Ex. Vol. I, pp. 66, 68.

[14] A third set of items was seized without judicial authorization under either the original or the "expanded" warrant. This included a black t-shirt, a white tank top, white socks, two black plastic clips not otherwise identified, black sweatpants, a red knotted kerchief, an account statement from First Merchants Bank, a device purporting to be a "hidden camera locator," a savings account ledger from Lafayette Bank and Trust, Knight's Inn stationary with handwritten dollar figures in the thousands, a Knight's Inn room card, several prepaid gift cards, a Faraday bag for shielding electronics from radio frequencies, a car rental agreement from a Hertz rental car agency in Lafayette, a gray satchel

---

[2] On defense counsel's motion, "for the record," the search warrant return was "judicial[ly] notice[d]" at a pretrial suppression hearing. Tr. p. 40. Precisely because it was noticed, the return is now *not* in the record.

containing an atlas of Indiana, and a blue satchel containing makeup and double-sided tape.

[15] The rental agreement was for the rental of a Mazda 2 for a period covering the April robbery. The small, black Mazda appeared similar to the small, black car recorded speeding away from the robbery scene by Walmart surveillance cameras. A detective of the Marion Police Department, Robin Young, had viewed the Walmart footage on the day of the robbery and was at the Lafayette house while the search warrant was executed.

[16] On its cover, the atlas of Indiana promised "Detailed Topographic Maps" showing "Back Roads" and "GPS Grids." Ex. Vol. I, p. 149. The atlas was found to have four consecutive pages torn out of it. Those pages, according to the atlas's index, featured maps of Lafayette, Marion, and surrounds.

[17] The day after the search warrant was executed, April 27, 2013, Judge Todd issued an arrest warrant for Funk on the basis of the fruits of the search disclosed at a probable cause hearing. Funk was still in the custody of the Lafayette police following his arrest the previous day. Funk was thereafter remanded to the custody of the Marion police and transported to Grant County.

### Pretrial Proceedings and Motions to Suppress

[18] Funk was charged with two counts of Class B felony robbery with a deadly weapon for the April robbery ("Count II") and the January robbery ("Count I"). Funk was further charged with being a habitual offender.

Funk filed three motions to suppress. The first, filed on May 8, 2015, sought the suppression of all evidence taken from Funk's cell phone and of all evidence found in the Lafayette house on the basis of staleness of the facts underlying the probable cause determination and because the officers treated the original warrant as a "general exploratory warrant," allowing them to rummage for any other items they wished to seize. Tr. p. 34. The State opposed the motion by arguing that all items seized were either covered by the original or extended warrants, or were found in plain view.

The court requested briefing, but only the State replied. On July 7, 2015, Funk's first motion was denied.

Funk's second and third motions were filed together on September 28, 2015. These sought suppression of the DNA sample taken from Funk after his arrest and of all of the evidence seized from the Lafayette house. As to the DNA sample, Funk argued that his detention from April 26, 2015, when he was arrested after leaving the Lafayette house, to April 27, 2015, when an arrest warrant issued, was unlawful, and that the DNA sample was therefore a fruit of the poisonous tree. As to the evidence seized from the Lafayette house, Funk argued that the lead investigator had knowingly or recklessly stated a falsehood when the investigator affirmed in his oral search warrant application that the piece of plastic recovered from the STAR bank had been dropped by the robber. The State responded, respectively, that the April 26, 2015, arrest of Funk was in a public place and supported by probable cause independent of the fruits of the

search, and that the STAR surveillance footage clearly showed the robber dropping the piece of plastic.

[22] On September 28, 2015, the court denied both motions.

### Jury Trial, Sentencing, and Appeal

[23] Funk's case was tried to a Grant County jury over four days from November 9, 2015, to November 13, 2015, with a one-day recess for Veteran's Day on November 11, 2015. At closing argument, the prosecutor made the following statement to the jury, referring to our supreme court's decision in *Gray v. State*, 903 N.E.2d 940 (Ind. 2009):

> [Y]ou will be asked to make a determination as to whether the State has convinced you . . . that when those robberies occurred, [Funk] was . . . armed with a deadly weapon. *You can find* that [Funk] was in possession [of a deadly weapon at the time of the robbery] even though [a deadly weapon] was never revealed. The Indiana Supreme Court back in 2009 made that clear in a case that in many respects is similar to this one[,] involving a gentleman by the name of Gray who had robbed two restaurant[s] . . . . As that trial proceeded . . . it was obvious that no one was in a position to say they actually saw [a] weapon, but much like this case, there was testimony that Mr. Gray had communicated to [his victims] that he had a weapon, either [orally] or by way of a note. He had also indicated to them his willingness to use it[,] that they would get hurt if they didn't follow his instructions. . . . [T]here was testimony [that] he had his hand inside his clothing or inside his pocket as if he was reaching for or holding onto that deadly weapon that he had communicated he had. As the Supreme Court analyzed that, they said the Defendant's statement or implication that he had a weapon is itself evidence that he was in fact armed. They

refer[r]ed to earlier cases . . . , one in which a defendant had told the victim he had a gun but it was not seen[,] and another case where [the defendant] communicated that by way of a note that he gave to the victim, just like occurred in this case. Finally, the Supreme Court said [that Gray's] statements, . . . his communications and his conduct at both of those restaurants *would be sufficient to permit a jury to find* he was in fact armed at the time of both offenses.

Tr. pp. 913-14 (emphasis added). The prosecutor went on to analogize Gray's case to Funk's. Defense counsel made no contemporaneous objection to any part of the prosecutor's argument.

[24] The jury returned a verdict of not guilty on Count I, the January robbery, and a verdict of guilty on Count II, the April robbery. The jury was then asked to find Funk a habitual offender; and they so found. A judgment of conviction was entered against Funk on December 29, 2015. The trial court concluded that, in view of Funk's extensive criminal history stretching back to 1956, "the only just sentence is the maximum sentence." Appellant's App. p. 20. Funk was accordingly sentenced to the maximum term of twenty years as a Class B felon, plus thirty years as a habitual offender, for a total term of fifty years. Funk was further ordered to pay restitution to STAR bank. This appeal followed.

[25] Funk first argues that it was reversible error to admit certain evidence seized from the Lafayette house without authorization under either the original or the expanded warrant. Specifically, Funk challenges the admission of the Hertz car rental agreement, the gray satchel containing the atlas of Indiana, and the blue satchel containing makeup and double-sided tape.

[26] Second, Funk argues the evidence was insufficient to prove possession of a deadly weapon beyond a reasonable doubt. Relatedly, Funk argues that reduction of Class B felony robbery with a deadly weapon to Class C felony robbery would require concomitant reduction of his habitual offender sentence.

[27] Finally, Funk argues that the prosecutor's analogies to *Gray* in closing argument were prosecutorial misconduct rising to the level of fundamental error, denying Funk a fair trial.

## Discussion and Decision

### I. The Seizure of the Challenged Evidence Was Within the Plain View Exception to the Warrant Requirement of the Fourth Amendment

[28] Our review of denials of motions to suppress, when following a trial at which the challenged evidence was admitted, is properly a review of the trial court's decision to admit the evidence. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). We review the trial court's ruling on admissibility for abuse of discretion, reversing only if the ruling is clearly against the logic and effect of the facts, and the error effects substantial rights. *Id.* The constitutionality of a search or seizure is a pure question of law we review de novo. *Id.*

[29] The Fourth Amendment to the federal constitution protects "[t]he right of the people to be secure in their . . . houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Warrantless searches and seizures, conducted outside the judicial process, are per se unreasonable and therefore unlawful, subject only to a few, well-delineated exceptions. *Katz v.*

*United States*, 389 U.S. 347, 357 (1967); *Bradley v. State*, 54 N.E.3d 996, 1000 (Ind. 2016). The State bears the burden of showing that an exception applied at the time of the search and seizure. *Berry v. State*, 704 N.E.2d 462, 465 (Ind. 1998). Although Funk cites to Article I, Section 11 of our state constitution, he fails to develop cogent argument specific to that provision and failed to do so in all three suppression motions filed below, citing to it only once in cursory fashion. Appellant's App. p. 125. Funk has therefore waived his state constitutional arguments. *Smith v. State*, 713 N.E.2d 338, 342 (Ind. Ct. App. 1999); Ind. Appellate Rule 46(A)(8)(a).

[30] Here, it is uncontested that the challenged evidence was seized outside the authorization of either the original or the extended warrant. The State therefore must show that an exception to the warrant requirement permitted its seizure. The State argues that the plain view doctrine permitted the seizure.

[31] Before considering this issue, we note what is *not* at issue in this appeal. First, Funk does not challenge the validity of either the first or the second, "expanded" warrant. Funk challenges only the application of the plain view doctrine, specifically claiming that the "argument based on plain view doctrine is void where a second request was made for additional items to be seized and these items were omitted from that second request." Appellant's Br. p. 14. Thus, Funk implies, had any of the items he challenges been included under either the first or the second warrant, Funk would have no case.

[32] This is a critical point, because, as explained *infra*, the applicability of the plain view doctrine in this case turns on the scope of the searches authorized under both warrants. Funk does not renew here the blanket challenges he raised below to the staleness of the facts underlying the initial warrant application and to the execution of the first warrant as a general, unconstrained rummaging. Moreover, Funk does not ask us to review whether the State carried its burden to show that the second, "expanded" warrant was valid. Importantly, because we have before us neither the warrant itself, nor a transcript of the oral warrant application, nor the search warrant return, we would be unable to say whether the lead investigator's oral application was "supported by [his] oath or affirmation," U.S. Const. amend IV, whether it "particularly describ[ed]" the items to be searched and seized, *id.*, or whether the search and seizure of those items was supported by probable cause. *Id.* We must therefore assume what the trial court was required to find in deciding to admit the challenged evidence: that both warrants were valid.

[33] Second, though Funk objected to the admission of each item of evidence below, Funk does not challenge all of the evidence seized purportedly in plain view. Rather, Funk restricts his appeal to three specific items: the Hertz car rental agreement, the gray satchel containing the atlas of Indiana, and the blue satchel containing makeup and double-sided tape. Appellant's Br. pp. 7, 13–14, 15, 17. We therefore restrict ourselves, as we must, to determining whether Funk is entitled to the specific relief he seeks.

[34] The plain view doctrine is one exception to the warrant requirement. *Horton v. California*, 496 U.S. 128, 133 (1990); *Jones v. State*, 783 N.E.2d 1132, 1137 (Ind. 2003). When police are in a place they have a right be, their observation of any item in plain view is not a "search" within the meaning of the Fourth Amendment and does not trigger the amendment's protections. *Arizona v. Hicks*, 480 U.S. 321, 324 (1987); *see Jones*, 783 N.E.2d at 1137. If police wish to search or seize an item in plain view, the incriminating character of the item must be immediately apparent. *Jones*, 783 N.E.2d at 1137. That is, probable cause to search or seize the item must be developed from the mere act of observing it, without any physical manipulation. *Hicks*, 480 U.S. at 324. The item may be incriminating without being per se unlawful to possess; the police must only have probable cause to believe that the item is linked to criminal activity. *United States v. Bruce*, 109 F.3d 323, 328 (7th Cir. 1997).

[35] "An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Horton*, 496 U.S. at 135; *see Jones*, 783 N.E.2d at 1137. In this context, the permissible vantage points for plain views are defined by the scope of the search warrant under which police are lawfully present. *Mack v. State*, 23 N.E.3d 742, 752 (Ind. Ct. App. 2014) (upholding officers' seizure of "nonfirearm evidence [from] places where they may have reasonably expected to find [the] firearms" listed in their search warrant); *see also, e.g., United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998) (upholding officers' seizure of

drug-crime evidence from a place where they reasonably believed they would find evidence of other criminal violations listed in their search warrant).

[36] Here, therefore, the seizure of the evidence challenged by Funk was lawful under the plain view doctrine if the evidence came into plain view while police were searching within the scope of the warrant, and the incriminating character of the evidence was immediately apparent without any physical manipulation outside the scope of the warrant.

[37] A search under a warrant must be confined in scope to the items particularly described in the warrant, lest the specific warrant be converted into a general warrant, one of the chief evils the Fourth Amendment was meant to guard against. *Horton*, 496 U.S. at 139-41; *see also Stanford v. Texas*, 379 U.S. 476, 481– 82 (1965) (describing colonial hatred of British writs of assistance giving "blanket authority to search"). "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found . . . . [T]he warrant that authorizes an officer to search a home for illegal weapons[, for example,] also provides authority to open closets, chests, drawers, and containers in which the weapon might be found." *United States v. Ross*, 456 U.S. 798, 820–21 (1982). Thus the lawful scope of a search is "defined by the object of the search and the place in which there is probable cause to believe it may be found." *Sowers v. State*, 724 N.E.2d 588, 589 (Ind. 2000) (quoting *Ross*, 456 U.S. at 824). "If [police] are looking for a canary's corpse, they can search a cupboard, but not a locket. If they are looking for an adolescent hippopotamus, they can search the living room or garage but not the microwave oven. If they

are searching for cocaine, they can search a container large enough to hold a gram, or perhaps less." *United States v. Evans*, 92 F.3d 540, 543 (7th Cir. 1996) (citations omitted). Once police have found the items described in the warrant, the search must end. *Horton*, 496 U.S. at 141 (If the "items named in the warrant had been found at the outset" of the search, "no [further] search for weapons could have taken place."). Here, the original warrant authorized police to search for, *inter alia*, a robbery note on a three-by-five index card and a real or airsoft handgun, and we will review each item of challenged evidence separately: the Hertz car rental agreement, the gray satchel containing the atlas of Indiana, and the blue satchel containing makeup and double-sided tape.

[38] The car rental agreement was found in Funk's loft bedroom. When first observed by the investigators,[3] the agreement appears to have been sitting face up on the floor of the bedroom, together with some other papers. On its face, the agreement specifies the model of the rented car, the distance driven, and a ten-day rental period from April 3, 2013, to April 13, 2013, covering the April 5, 2013, STAR bank robbery. Lying face up on the floor, the item was in plain view to officers lawfully in the bedroom. Particularly in the context of the Walmart surveillance footage, the link to criminal activity was immediately

---

[3] A detective of the Marion Police Department, Mark Stefanatos, directed the warrant execution inside the Lafayette house. Before an area of the house was searched, the detective would photograph it, in part to "capture anything that might be in plain view [and] to show its location . . . ." Tr. p. 649. The detective directed his colleagues to notify him immediately when they discovered an item of interest, before "that item was touched, moved, [or] disturbed in any way." Tr. p. 648. The detective would then photograph the item before it was searched or seized. *Id.* Some of these photographs are in the record before us. *See* Tr. p. 687 ff.

apparent. The model, distance driven, and rental period together give rise to probable cause to believe that the rented car was linked to the April 5, 2015, bank robbery. The seizure of the rental agreement was therefore lawful and we find no error in its admission.

[39] The gray satchel containing the atlas of Indiana was also found in Funk's bedroom. The detective who directed the warrant execution gave conflicting testimony as to where the satchel and atlas were first observed. *Compare* Tr. p. 664 ("I believe [the satchel and the atlas were] found on the bed . . . .") *and* Ex. Vol. I, p. 149 (photograph of atlas face up on the bed) *with* Tr. p. 696 (identifying St.'s Ex. 98, a photograph of "a trash can and the little . . . gray satchel . . . with the road maps" sitting on the floor next to a dresser). Even if the satchel had to be opened before the atlas came into view, opening the satchel was well within the scope of the search warrant, as it could well be a container for many smaller things covered by the warrant. From its size and shape, the satchel was evidently capable of containing a handgun or a robbery note on a three-by-five index card. Once the satchel was opened and the atlas produced, the atlas's incriminating character was immediately apparent, even before it was opened and the missing pages discovered. Maps, particularly those featuring "Back Roads," are obviously useful to a bank robber traveling from one town to the next and wishing to avoid being noticed. *See United States v. Walton*, 814 F.2d 376, 380 (7th Cir. 1987) (in a bank robbery case, upholding admission of, *inter alia*, "maps" as "so obviously related to the crime that . . . they were quite properly seized" when found in plain view). The seizure of the

satchel and the atlas was therefore lawful and we find no error in their admission.

[40] Finally, a blue satchel containing makeup and double-sided tape was also found in Funk's bedroom. It does not appear in the record where in the room the satchel was first observed and whether it was open or closed at the time. Nevertheless, opening the blue satchel, like the gray satchel, was well within the scope of the search warrant, as it was evidently capable of being a container for many smaller things covered by the warrant. Once opened, the bag was found to contain not only makeup and double-sided tape, but also glue sticks, super glue tubes, sunglasses, a screwdriver, screws, and a "slim jim," a device apparently used to unlock cars. Tr. p. 669. In the context of a masked, disguised robber, the link to criminal activity furnished by these items was obvious. *See* Tr. p. 68 (describing usefulness of makeup and other items to a disguised robber). The seizure of the satchel and its contents was therefore lawful and we find no error in their admission.

[41] Funk argues that the argument from plain view "is void where a second request was made for additional items to be seized [under the warrant extension] and [other] items were omitted from that second request." Appellant's Br. p. 14. This argument is puzzling, as warrantless seizure is precisely what the plain view doctrine operates to excuse, no matter how many warrants or warrant extensions were sought earlier. Relying on this court's decision in *Conn v. State*, 496 N.E.2d 604 (Ind. Ct. App. 1986), Funk argues that the rationale for the plain view doctrine is to "avoid inconvenience to officers in having to procure

another warrant." Appellant's Br. p. 13. The officers here sought a second authorization to search; therefore, Funk implies, it would not have been inconvenient for the officers to have sought a third, or to have included the challenged items in the second, and the plain view doctrine cannot apply. Funk cites no case adopting this reasoning.

[42] This argument lacks merit. The plain view doctrine applies categorically. Its application does not depend on whether it serves the convenience of police in any particular case. Indeed, it is *always* more convenient for police simply to seize an item than to ask a magistrate's permission to do so, no matter how conveniently the magistrate may be reached. More importantly, the plain view doctrine is *not* the result of weighting the interest in official convenience more heavily than individual privacy interests. Rather, where items are in plain view from a lawful vantage point and their incriminating character is immediately apparent, *no* Fourth Amendment interest is served by application of the warrant requirement. "[B]y hypothesis, the seizure of an object in plain view does not involve an intrusion on privacy." *Horton*, 496 U.S. at 141.

[43] We therefore conclude that all the challenged items were seized within the plain view exception to the warrant requirement and properly admitted at trial.

### II. There Was Sufficient Evidence for Jury to Find That Funk Was Armed with a Deadly Weapon at the Time of the Robbery

[44] Funk argues that his conviction for Class B felony robbery with a deadly weapon must be reduced to Class C felony robbery, *see* Ind. Code § 35-42-5-1

(2013), because the State did not present sufficient evidence for the jury to find beyond a reasonable doubt that Funk was armed with a deadly weapon.

[45] We review challenges to the sufficiency of the evidence supporting a conviction with great deference to the factfinder. We neither reweigh the evidence nor re-evaluate the credibility of witnesses. *Gray v. State*, 903 N.E.2d 940, 943 (Ind. 2009). We will affirm the conviction unless there is no evidence of probative value supporting an element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.* We view the facts and the inferences from them in the light most favorable to the judgment below. *Id.*

[46] In *Gray*, our supreme court considered the proof required to sustain a conviction for robbery with a deadly weapon. Gray was convicted of robbing two restaurants with a gun. 903 N.E.2d at 941. No witness testified to seeing a gun during either robbery. *Id.* at 945. Gray was apprehended by police within seconds of the second robbery, and no gun was found; the second conviction was accordingly reversed. *Id.* at 946. The conviction for the first robbery, however, was sustained on the following facts. During the robbery, Gray kept his right hand in his jacket pocket as he gave commands to restaurant employees. *Id.* at 942. Witnesses testified to seeing "something" and a "black handle" in Gray's right pocket, and speculated that Gray had a gun. *Id.* Gray told restaurant employees "to stay calm and no one would get hurt." *Id.*

[47]     The *Gray* court noted that a conviction for robbery with a deadly weapon may be sustained even if the weapon was not seen during the robbery or admitted into evidence at trial. *Id.* at 943. A defendant's statement that he had a weapon is probative evidence "that he was in fact armed." *Id.* at 945. Moreover, though Gray did not explicitly refer to a gun, Gray's "conduct and statements [during the first robbery] . . . permitted the jury to infer that Gray had communicated . . . that he had a gun." *Id.* Gray's "keeping his hand in his pocket and statements that 'no one would get hurt' if the employees cooperated clearly implied that he could and would injure those who resisted . . . ." *Id.* at 945–46.

[48]     In the case before us, Funk expressly communicated to his victim, through the robbery note, that he had a weapon. Like Gray, Funk clearly and purposefully reached his hand into his pocket and kept it there until the robbery was complete. Together with the robbery note's commands not to trigger an alarm and to surrender the money in the drawer, Funk's conduct and statements, like Gray's, clearly implied that he could and would injure those who resisted. From these facts, the jury was permitted to find that Funk had a weapon at the time of the robbery.

[49]     In Funk's bedroom, police found a box of ammunition missing five rounds. The jury heard that the type of ammunition found is commonly used in five-round revolvers. One of the two robbery checklists found in Funk's bedroom noted "gun ✓." Almost all of the other items on the checklists were either admitted into evidence or plainly visible on the bank's surveillance footage, including the note, the glue, the mask, bags for the robbery money, the scanners, the

coveralls, the cosmetic bag, and the jammer. These facts are all probative evidence that Funk planned to and did in fact possess a deadly weapon—a gun—at the time of the robbery. Accordingly, these facts are sufficient to sustain the jury's verdict.[4]

[50] For these reasons, Funk's conviction for Class B felony robbery with a deadly weapon must be affirmed. This conclusion simultaneously disposes of Funk's argument for reducing his habitual offender sentence in the State's favor.

### III. The Prosecutor Committed No Misconduct in Correctly Stating the Law, and the Effect of Any Improper Inference Was Cured by the Trial Court's Instructions

[51] Finally, Funk argues that the prosecutor committed reversible misconduct by his references to *Gray* in closing argument.

[52] Prosecutorial misconduct is reversible error where misconduct occurred that placed the defendant in a position of grave peril to which he would not have been subjected absent the misconduct. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind.

---

[4] Funk points out that the dropped piece of plastic containing Funk's DNA was at one point identified as a piece of an airsoft gun, *see supra* note 1, and argues that an airsoft gun is not a deadly weapon within the meaning of the statute. For the reasons set out above, however, the jury had sufficient evidence before it to conclude Funk was armed with a real gun at the time of the robbery.

Moreover, the identification of the plastic piece as perhaps from an airsoft gun was made at an oral probable cause hearing, *see supra* note 1, and was never heard by the jury. Thus, the jury had no evidentiary basis to conclude that Funk had carried an airsoft gun during the robbery. We will not presume that the jury went outside the evidence in disregard of its instructions. *Isom v. State*, 31 N.E.3d 469, 481 (Ind. 2015) (reviewing court presumes jury obeyed trial court's instructions), Appellant's App. p. 314 (instruction to the jury that "[t]he State must prove each element of the crime by *evidence* . . . ." (emphasis added)).

We therefore need not reach the statutory interpretation question posed by Funk.

2014). Whether misconduct occurred is answered from case law and the Indiana Rules of Professional Conduct. *Id.* Whether the peril was sufficiently grave is determined with reference to the probable persuasive effect of the misconduct on the jury's decision. *Id.*

[53] Where, as here, no contemporaneous objection was made to the prosecutor's conduct at trial, the defendant must further show that the alleged error was fundamental. *Id.* Fundamental error is error so prejudicial to the defendant's rights that a fair trial is impossible. *Id.* at 667-68.

[54] We find that the prosecutor committed no misconduct. Moreover, any improper peril to Funk caused by the prosecutor's statements was cured by the court's instructions. We therefore conclude that Funk was not denied a fair trial.

[55] As a general matter, we

> have held before that it is proper for counsel to argue both law and facts in a closing statement. *Nelson v. State*, 792 N.E.2d 588, 593 (Ind. Ct. App. 2003), *trans. denied*. Our supreme court has held that reading case law to the jury is proper in final argument so long as it is clear that the prosecutor is reading or referring to a separate case. *Hernandez v. State*, 439 N.E.2d 625, 630 (Ind. 1982) (citing *Griffin v. State*, 275 Ind. 107, 114, 415 N.E.2d 60, 65 (1981)).

*Harrison v. State*, 32 N.E.3d 240, 256 (Ind. Ct. App. 2015), *trans. denied*. Here, the prosecutor's references to the "Indiana Supreme Court back in 2009," Tr. p. 913, to "a gentleman by the name of Gray" and "Mr. Gray," *id.*, to how "the

Supreme Court analyzed" the facts in that case, Tr. p. 914, and to what "the Supreme Court said [about Gray's] statements," *id.*, all made unmistakably clear to the jury that the prosecutor was referring to a separate case.

[56]     The particular misconduct alleged by Funk is that the prosecutor, while correctly stating the law of *Gray*, impermissibly invaded the constitutional province of the jury "to determine the law and the facts," Ind. Const. art. I, § 19, by incorrectly suggesting that the *Gray* decision required the jury to find that Funk had been armed with a deadly weapon at the time of the robbery. *See* Ind. Professional Conduct Rule 3.3 (duty of candor to the tribunal).

[57]     This is not what the prosecutor did. First, as Funk concedes, the prosecutor did not misstate the holding of *Gray* or the elements of robbery with a deadly weapon. Further, far from leaving the impression that *Gray compelled* the jury to make a certain finding, the prosecutor's argument was carefully cast in terms of what that case *permitted* the jury to find. The prosecutor prefaced his discussion of *Gray* by observing that some jurors might think it "problematic" to find possession of a deadly weapon when no weapon was ever seen or admitted into evidence. Tr. p. 913. The prosecutor said, "You *can* find that [Funk] was in possession [of a deadly weapon at the time of the robbery] even though [a deadly weapon] was never revealed. The Indiana Supreme Court back in 2009 made that [*scil.*, that the jury *can* find possession under those circumstances] clear . . . ." Tr. p. 913 (emphasis added). The prosecutor concluded, "[T]he Supreme Court said [the evidence against Gray] *would be sufficient to permit a jury to find* he was in fact armed at the time of both offenses." Tr. p. 914 (emphasis

added). Funk's argument that the prosecutor left an impermissible "impression" of compulsion is defeated by the prosecutor's express language of permission. Appellant's Br. p. 25.

[58] In addition, any impermissible inference created by the prosecutor's statements was dispelled by the court's jury instructions. *Hollowell v. State*, 707 N.E.2d 1014, 1025 (Ind. Ct. App. 1999) ("[F]inal instructions are presumed to correct any misstatements of law made during final arguments."). The trial court finally instructed the jurors that "[t]he State has the burden to prove [Funk] was armed with a deadly weapon," Appellant's App. p. 308, that their "verdicts should be based on the law and the facts as [they] find them," *id.* at 316, and that "[s]tatements made by attorneys are not evidence." *Id.* at 317. Moreover, the jury had been preliminarily instructed that "[t]he Court's instructions are [their] best source in determining the law." *Id.* at 278. We conclude that the vanishingly small risk of an improper inference created by the prosecutor's arguments cannot overcome the presumption of propriety enjoyed by a properly instructed jury.

[59] For all of these reasons, the prosecutor committed no misconduct, and Funk was not denied a fair trial.

## Conclusion

[60] The evidence challenged by Funk was properly admitted against him. All the evidence was sufficient to sustain his conviction on appeal. The prosecutor's

closing argument did not deny Funk a fair trial. For these reasons, his conviction for Class B felony robbery armed with a deadly weapon is affirmed.

[61] Affirmed.

Robb, J., and Brown, J., concur.