## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 26 2017, 9:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ryan Remling,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 26, 2017<br><br>Court of Appeals Case No.<br>82A01-1705-CR-1063<br><br>Appeal from the Vanderburgh Circuit Court<br><br>The Honorable David D. Kiely, Judge<br><br>The Honorable Michael J. Cox, Magistrate<br><br>Trial Court Cause No.<br>82C01-1612-F1-6975 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Ryan A. Remling (Remling), appeals his conviction for four Counts of Level 1 felony child molesting, Ind. Code § 35-42-4-3(a)(1).

We affirm.

# ISSUES

Remling raises two issues on appeal, which we restate as follows:

(1) Whether the trial court erred in permitting the State to amend the charging Information after a jury trial had commenced; and

(2) Whether Remling knowingly, intelligently, and voluntarily waived his right to counsel.

# FACTS AND PROCEDURAL HISTORY

A.S. was born on November 19, 2011. She lives with her parents and four siblings in Evansville, Vanderburgh County, Indiana. In the latter part of 2016, A.S.'s sixteen-year-old sister, E.S., met twenty-four-year-old Remling at a church function and subsequently began communicating with him through social media. Remling was interested in pursuing a relationship with E.S., and he began spending time at her family's home. At the time, Remling did not have his own means of transportation, so E.S. and A.S.'s father arranged to drive Remling to work in exchange for Remling's assistance with various tasks around the house. Because Remling's employment through a professional cleaning service required him to work unusual hours, it was not uncommon for him to spend the night on the family's couch.

[5] On November 30, 2016, Remling babysat five-year-old A.S. for a few hours while her parents were out of the house. That evening, when E.S. arrived home from church, she observed that her mother and A.S. were watching television in the living room while Remling was preparing dinner in the kitchen. E.S. went into the kitchen and asked Remling if she could borrow his cell phone in order to access her Facebook account. With Remling's permission, E.S. picked the phone up off the table, at which time a notification appeared on the phone indicating that a video had just been saved. "[B]eing nosey," E.S. watched the video, which she described as depicting Remling "forcing my little sister [*i.e.*, A.S.] to do sexual acts on him." (Tr. Vol. III, p. 30). After viewing the recording, E.S. locked herself in the bathroom and called her father, who, after hearing about the video, instructed E.S. to call the police. Concerned about preserving the video, E.S. forwarded it from Remling's phone to her Facebook account. As she was doing so, another notification appeared indicating that another video had completed saving. E.S. watched the second video and, again, observed Remling engaging in sexual conduct with five-year-old A.S. Like the first video, E.S. forwarded the second recording to her Facebook account "so that [she] had proof." (Tr. Vol. III, p. 31).

[6] When E.S. emerged from the restroom, she ushered her mother and siblings into a bedroom and locked the door, informing her mother that she had discovered "videos that were very inappropriate." (Tr. Vol. III, p. 32). Meanwhile, Remling "kept trying to talk to me, I told him to stay away from me, not to say anything to me, to leave me alone and that he needed to leave."

(Tr. Vol. III, p. 31). Remling, however, continuously knocked on the bedroom door, begging to talk to E.S. and apologizing "for whatever [he] did." (Tr. Vol. III, p. 31). The Evansville Police Department arrived a short time later and arrested Remling. Immediately after Remling's arrest, A.S. participated in a forensic child interview, during which she identified Remling as having perpetrated acts of molestation against her.

[7] During the police investigation, Remling's cell phone and his laptop were seized and inspected by a cybercrimes investigator. Three recordings were retrieved from Remling's cell phone, despite Remling's attempt to delete them, which were consistent with the molestation allegations against A.S. In addition, two videos were recovered from Remling's laptop, where they had been stored in a file dedicated for pornography, which also depicted acts of molestation against A.S. Specifically, the first video was taken on November 30, 2016, at 5:15 p.m. and lasted two minutes and seven seconds; it "shows a hand[,] and the subject spreads the labia of [a prepubescent] female and then exposing her vagina opening then the subject digitally penetrating the female's anus . . . with his small finger." (Tr. Vol. III, p. 68). The second video was also taken on November 30, 2016, at 6:03 p.m. and is forty-one seconds long; "[i]t shows a female child performing fellatio on an adult male." (Tr. Vol. III, p. 73). The third video was taken fifty-seven seconds after the second video and is one minute in length; "[i]t shows a . . . child performing fellatio on a male subject again." (Tr. Vol. III, p. 76). The fourth video was recorded on November 17, 2016, at 5:18 p.m. and is two minutes and thirty seconds in

length; it "shows a prepubescent female and it appears she's sitting on the lap of the subject . . . , again the subject spreads the labia of the female and then digitally penetrates her labia." (Tr. Vol. III, p. 79). Finally, the fifth video was recorded on November 25, 2016, and is one minute and six seconds in length; "[i]t shows again a prepubescent female, it appears she's sitting on a brown piece of furniture, subject's hand is seen spreading the female's labia exposing her vaginal opening and then the subject digitally penetrates her labia vagina [*sic*]." (Tr. Vol. III, pp. 81-82). In one of the videos, the "voice of a small child" can be heard saying "please stop it." (Tr. Vol. III, p. 122).

[8] Although Remling's face was not clearly visible in these videos retrieved from his phone and laptop, his clothing and distinguishing scars/scabs were consistent with those of the suspect observed in the recordings. When his apartment was searched, police discovered a garbage bag containing "[a] whole bunch of [children's] panties," some of which were consistent with the size and design worn by A.S. (Tr. Vol. III, p. 53). During Remling's police interview, he initially denied any wrongdoing before stating that "he didn't remember doing anything like that." (Tr. Vol. III, p. 87). When asked whether officers would discover any other evidence, Remling replied, "I sure as hell hope not." (Tr. Vol. III, p. 88).

[9] On December 2, 2016, the State filed an Information, charging Remling with four Counts of child molesting as Level 1 felonies, I.C. § 35-42-4-3(a)(1). Specifically, the Information alleged that, on four separate occasions, Remling, "a person of at least twenty-one (21) years of age, did submit to other sexual

conduct as defined in Indiana Code Section 35-31.5-2-221.5[1] with [A.S.], a child under the age of fourteen years (14), to-wit: November 19, 2011." (Appellant's Conf. App. Vol. II, p. 14).

[10] On March 20-21, 2017, the trial court conducted a jury trial. Prior to *voir dire*, the State moved to amend the charging Information to track the statutory language for each of the four Counts of child molesting, such that Remling was alleged to have "performed or submit[ted] to other sexual conduct, rather than just[] submit[ted] to." (Tr. Vol. III, p. 5). Remling did not object based on the change being "an accurate statement of the statute." (Tr. Vol. III, p. 6). Accordingly, the trial court permitted the change. Thereafter, a jury panel was selected. Following the State's first witness, the State again moved to amend the charging Information. The State explained that upon review of the Information, it discovered that "the knowing and intentional element as required by statute was left out of the form of the [I]nformation that is pursuant to the statute." (Tr. Vol. III, p. 41). Based on the fact that "a jury has already been seated, jeopardy has attached," Remling objected to the amendment as being "a material change." (Tr. Vol. III, p. 41). The trial court found the change to be one of form rather than substance and allowed the amendment of the Information to include the requisite element of the defendant's mental state

---

[1] "'Other sexual conduct' means an act involving: (1) a sex organ of one (1) person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object." I.C. § 35-31.5-2-221.5.

in each of the four Counts. As a result, Remling moved for a mistrial and a continuance, both of which the trial court denied. The jury trial proceeded.

[11] At the close of the evidence, Remling informed the court that he wished to proceed *pro se* in order to deliver his own closing argument. The trial court advised Remling of the perils of self-representation; nevertheless, Remling insisted that he did not want the assistance of counsel in making his final argument. The trial court granted Remling's request and appointed Remling's previously acting attorney as standby counsel. Following closing arguments, the jury returned a guilty verdict on all Counts, and the trial court entered a judgment of conviction on the same. At this point, Remling again moved for a mistrial, contending that his "case was not handled properly at all. I want a new judge, I want a new lawyer, I want people who know what they're doing." (Tr. Vol. III, p. 198). The trial court denied Remling's motion.

[12] On April 20, 2017, the trial court held a sentencing hearing. The trial court imposed a twenty-five-year sentence for each of the four Counts, with Counts I and II to run concurrently with each other and Counts III and IV to run consecutively to Counts I and II and to each other. Thus, Remling received an aggregate, fully executed sentence of seventy-five years.

[13] Remling now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Amendment of Information*

Remling claims that the trial court erroneously permitted the State to amend the charging Information. Following the State's first witness, the State moved to amend the Information to add the "knowingly or intentionally" language required by statute for a child molesting charge. I.C. § 35-42-4-3(a). It is well established that "[t]he purpose of a charging information is to advise the accused of the particular offense charged so that he can prepare a defense and so that he can be protected from being twice placed in jeopardy for the same offense." *Truax v. State*, 856 N.E.2d 116, 123 (Ind. Ct. App. 2006) (citations omitted). Thus, a charging information must "be in writing and allege the commission of an offense by '[s]etting forth the nature and elements of the offense charged in plain and concise language without unnecessary repetition.' The information should state the offense in the language of the statute or in words that convey a similar meaning." *Id.* (quoting I.C. § 35-34-1-2(a)(4)).

Pursuant to Indiana Code section 35-34-1-5, "[a] charging information may be amended at various stages of a prosecution, depending on whether the amendment is to the form or to the substance of the original information." *Erkins v. State*, 13 N.E.3d 400, 405 (Ind. 2014). The statute specifically provides that an information "may be amended on motion by the prosecuting attorney at any time because of any immaterial defect." I.C. § 35-34-1-5(a). Immaterial defects may include, in part, spelling and grammatical errors; the misjoinder of parties; the failure to state the time or place of the offense where such

information is not of the essence of the offense; or "any other defect which does not prejudice the substantial rights of the defendant." I.C. § 35-34-1-5(a)(1),(2),(7),(9). On the other hand, an information "may be amended in matters of substance . . . by the prosecuting attorney, upon giving written notice to the defendant at any time" up to thirty days prior to the omnibus date where the defendant is charged with a felony or "before the commencement of trial" "if the amendment does not prejudice the substantial rights of the defendant." I.C. § 35-34-1-5(b)(1)-(2). Furthermore, "[u]pon motion of the prosecuting attorney, the court may, at any time before, during, or after the trial, permit an amendment to the . . . information in respect to any defect, imperfection, or omission in form which does not prejudice the substantial rights of the defendant." I.C. § 35-34-1-5(c).

[16] In sum, "[a]n amendment of substance is not permissible after trial has commenced." *Blythe v. State*, 14 N.E.3d 823, 828 (Ind. Ct. App. 2014). After trial has begun, only amendments to fix defects, imperfections, or omission in form are permitted, so long as the substantial rights of the defendant are not prejudiced. *Id.* Here, Remling contends that the addition of the mental element constituted a substantive change and, therefore, was an improper amendment after the commencement of trial. He insists that the State omitted an essential element from the Information, and he could not have been convicted as charged. Thus, he argues that the amendment was substantive because it "was 'essential to making a valid charge of the crime.'" (Appellant's Br. p. 16).

[17] Whether an amendment is substantive or one of form is a matter of law, which our court reviews *de novo*. *Blythe*, 14 N.E.3d at 829.

> [A]n amendment is one of form, not substance, if both (a) a defense under the original information would be equally available after the amendment, and (b) the accused's evidence would apply equally to the information in either form. And an amendment is one of substance only if it is essential to making a valid charge of the crime.

*Id.* (quoting *Fajardo v. State*, 859 N.E.2d 1201, 1207 (Ind. 2007)). Because an amendment of form is permissible only if it does not prejudice a defendant's substantial rights, we note that "[a] defendant's substantial rights include a right to sufficient notice and an opportunity to be heard regarding the charge; and, if the amendment does not affect any particular defense or change the positions of either of the parties, it does not violate these rights." *Id.* (internal quotation marks omitted) (quoting *Erkins*, 13 N.E.3d at 405). "Ultimately, the question is whether the defendant had a reasonable opportunity to prepare for and defend against the charges." *Id.* (quoting *Erkins*, 13 N.E.3d at 405).

[18] In *Brown v. State*, 912 N.E.2d 881, 887 (Ind. Ct. App. 2009), *trans. denied*, the defendant challenged a trial court's ruling to allow the State to amend the charging information "[t]wo days after the start of trial . . . to add language regarding intent" to one of the charges. Specifically, the defendant's original charge of "knowingly or intentionally possess[ing] a picture, [etc.] that depicts or describes sexual conduct by a child who is less than sixteen (16) years of age" was amended to state that the defendant had "knowingly or intentionally

possess[ed] a picture, [etc.] that depicts or describes sexual conduct by a child who is less than sixteen (16) years of age . . . *intended to satisfy or arouse the sexual desires of any person.*" *Id.* at 891-92. This court found "that the amendment adding the intent language did not 'materially change the substance of the offense' and did not affect the presentation of [the defendant's] defense." *Id.* at 892. We reasoned that

> [t]he charge before and after the amendment was possession of child pornography, and the essential elements of the crime remain unchanged. By adding the intent language, the State made the charging information conform to the statutory language defining sexual conduct in the context of the possession of child pornography statute and essentially increased its burden by adding an additional element to be proved by the State.

*Id.*

[19] We find that the rationale in *Brown* is applicable in the present case. The original charging Information clearly indicated that Remling was being charged with four Counts of child molesting as Level 1 felonies pursuant to Indiana Code section 35-42-4-3(a)(1). The Information stated that Remling "did submit to [or perform] other sexual conduct" with A.S. (Appellant's Conf. App. Vol. II, p. 14). The cited statute requires that the defendant "knowingly or intentionally" perform or submit to other sexual conduct. I.C. § 35-42-4-3(a). By charging that Remling *did* submit to or perform other sexual conduct under this statute, there is a clear inference that Remling did so with the required intent. The State's amendment did not materially change the substance of the

offense such as by including additional or different crimes; rather, the amendment merely caused the four charges to conform to the statutory language and reflected an additional element that the State was already statutorily obligated to prove.

[20] Remling contends that the amendment "eviscerated an ironclad defense to the information . . . *i.e.*[,] Remling's ability to demand a mistrial due to the State's failure to charge a cognizable offense." (Appellant's Br. p. 17). We find no merit in this assertion. The original Information (after its first amendment, to which Remling did not object) clearly apprised Remling that he was being charged with Level 1 felony child molesting for performing or submitting to other sexual conduct with A.S. on four separate occasions. The addition of the statutory intent language did not change Remling's ability to defend against these child molesting charges. Accordingly, the trial court did not err in granting the State's request to amend the Information after the commencement of trial because we find that the change was one of form, rather than substance, and it did not prejudice Remling's substantial rights.

## II. *Self-Representation*

[21] Remling also claims that the trial court erroneously allowed him to proceed *pro se* for the purpose of closing arguments. Both the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution "guarantee a criminal defendant the right to appointed counsel." *Jones v. State*, 783 N.E.2d 1132, 1138 (Ind. 2003). Implicit in this right is the right to self-representation. *Drake v. State*, 895 N.E.2d 389, 392 (Ind. Ct. App. 2008). Self-

representation, however, results in a defendant forfeiting the "many benefits" of having the assistance of counsel. *Id.* Thus, "when a criminal defendant waives his right to counsel and elects to proceed *pro se*, we must decide whether the trial court properly determined that the defendant's waiver was knowing, intelligent, and voluntary." *Jones*, 783 N.E.2d at 1138. Moreover, "when a defendant asserts his or her right to self-representation, the trial court should advise the defendant of the 'dangers and disadvantages of self-representation.'" *Drake*, 895 N.E.2d at 392 (quoting *Faretta v. California*, 422 U.S. 806, 835 (1975)).

[22] While "there are no specific 'talking points' when advising a defendant of the dangers and disadvantages of proceeding without counsel," a trial court must "come to a 'considered determination' that the defendant is making a knowing, voluntary, and intelligent waiver of his or her right to counsel." *Id.* (quoting *Poynter v. State*, 749 N.E.2d 1122, 1126 (Ind. 2001)). "'[T]he law indulges every reasonable presumption against a waiver of this fundamental right.'" *Id.* (quoting *Poynter*, 749 N.E.2d at 1126). In determining whether a defendant has knowingly, intelligently, and voluntarily waived his or her right to counsel, our supreme court has enumerated four factors to consider:

> (1) the extent of the court's inquiry into the defendant's decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed *pro se*.

*Id.* (quoting *Poynter*, 749 N.E.2d at 1127-28).

[23]  After Remling announced his desire to represent himself for the final leg of his trial, the trial court inquired and advised Remling as follows:

> THE COURT:  I need to ask why on earth would you want to do that?
> [REMLING]:  I feel that my defense has been poorly handled.
> THE COURT:  Okay, I have to advise you of the perils of self-representation.
> [REMLING]:  I understand.
> THE COURT:  And I assume that your attorney had a bit of a conversation with you about the perils of self-representation?
> [REMLING]:  A short one, he said that you would explain what they are, so let's hear it.
> THE COURT:  Okay, may I presume that you are not an attorney?
> [REMLING]:  Correct.
> THE COURT:  How far did you get in school?
> [REMLING]:  I dropped out of high school.  I finished a portion of my first year in high school and it was choppy during the final years.  I got my GED diploma and I had dropped out of Ivy Tech Community College.
> THE COURT:  May I take it then that you do not know the rules of evidence?
> [REMLING]:  Just refresh, just go ahead, it's like whatever it is I really--
> THE COURT:  They're contained in this book right here, this is called the--
> [REMLING]:  I've never seen that before.
> THE COURT:  --2017 Indiana Rules of Court and within that there are rules of evidence that [your attorney] is very familiar with.
> [REMLING]:  Alright.
> THE COURT:  And [your attorney] knows what evidence can be introduced, what evidence is objectionable, and he knows how to

make an objection and I assume that you don't know how to do that and don't you think that would be an issue for you to continue in this trial at this very last--

[REMLING]: My question is, will I be able to address the jury?

THE COURT: Mr. Remling, when I'm speaking you're not, we take turns here, you understand? And I presume that you would not be able to follow those rules of evidence because you're not familiar with them, isn't that correct?

[REMLING]: Correct.

THE COURT: Okay, what is it you want to tell me, sir?

[REMLING]: The thing is that I feel that several things have been done wrong. It is my understanding that the jury is in power in this courtroom being as it is the jury, my question to your objections to my evidence as far as relevancy, I believe since the jury, the jury makes the decision on guilty or innocent. I believe they also should make the decision on relevancy.

THE COURT: No, those are rules of evidence sir, and I strictly control the evidence that's introduced in the courtroom, that's my job.

[REMLING]: Are the juries not mediators in this?

THE COURT: The jury is not, they are not mediators.

[REMLING]: What power do they hold?

THE COURT: They are the trier of fact, they make the decision with regard to your guilt or they determine the verdict, whether it's guilt[y] or not guilty.

[REMLING]: Alright, I believe I read in a 2016 manual that's provided in the jailhouse that the jury can decide the law as well, it said it in those words somehow.

THE COURT: Yes.

[REMLING]: That they decide the law.

THE COURT: They, they, yes.

[REMLING]: In what pretense?

THE COURT: And they will be instructed to that effect.

[REMLING]: Alright.

THE COURT: But the [c]ourt controls the admissibility of evidence, okay? Do you happen to know the rules of criminal trial procedure?

[REMLING]: No.

THE COURT: Do you know the elements of the crime with which you've been charged?

[REMLING]: Yes, I know the elements.

THE COURT: Have you ever represented yourself?

[REMLING]: No, I am very well unexperienced in this matter, but I am looking at two options--

THE COURT: And by that mere fact sir, don't you think it's a good idea that your experienced criminal defense attorney continue to represent you during this trial because my concern is sir that if you choose to give a closing statement that you are going to continue to try to testify to things that might be objectionable and if the deputy prosecutor objects, and I sustain it, you're not going to be able to talk about that. I don't know what you're wanting to say to the jury.

[REMLING]: Constitutional right to be informed is being stomped on there on the jury's behalf, isn't that conceivable?

THE COURT: Sir, I'm going to control, again, let's get this clear, I'm going to control the admissibility of evidence. The evidence is now over. This is just argument from here on out, okay. So if you're wanting to get up there in front of the jury and make some sort of statement that the prosecutor objects to and I sustain, you're not going to be able to say that in front of the jury and if you continue, if you persist with trying to make those arguments or those statements to the jury, then I'm going to have to sit you down and stop you, you understand that?

[REMLING]: Like I said to--

THE COURT: So I think it's a really good idea for you to reconsider this decision, okay?

[REMLING]: I motion for another attorney at that point.

THE COURT: No.

[REMLING]: No.

THE COURT: Once I have removed [your attorney] and I appoint him as standby counsel, he's not going to then get to come back up there and be your attorney.

[REMLING]: No, no, no, can I get a different attorney . . . ?

THE COURT: No, [your attorney] has represented you through

this entire trial, almost to the absolute end here, so I'm not going to allow you to have another attorney.

[REMLING]: What's the difference if I appeal the decision?

* * * *

THE COURT: Well you don't have the right to appeal at this particular--

[REMLING]: If I appeal the decision would I not be able to go and get another attorney on the matter?

THE COURT: Sir, the jury has not rendered a verdict, so you have no right to appeal at this particular point in time.

[REMLING]: I understand what the verdict is going to be at this point with the hindrances that are being caused towards my account.

THE COURT: What are those, sir?

[REMLING]: I am not being able to freely speak my piece. Constitutional right, freedom of speech, constitutional right, right to be informed, both of those are being slashed in this courtroom.

THE COURT: You were informed sir and your attorney asked for the [c]ourt to discuss with you what your anticipated testimony would be, and I explained to you what the [c]ourt was going to view as relevant and not relevant, okay? The [c]ourt strictly controls the rules of evidence, the admissibility of . . . evidence in this courtroom, okay?

[REMLING]: I think that the jury would find those rules very unfair as well as I do.

THE COURT: Well, they don't get to make that choice nor do you. So sir, you have the absolute right to represent yourself, okay? The problem with representing yourself is that you may say something that is objectionable okay, do you understand that, and that the [c]ourt may not allow, do you understand that?

* * * *

[REMLING]: Yeah, I understand what you say, I understand the power that you hold, I understand how I'm a fucking wheelchair bound cripple--

THE COURT: See, there you go sir, you're not, I'm not going to allow you to talk like that in the courtroom. We're not going to have vulgarity in the courtroom, do you understand that? If you

were to say that in front of the jury, I'd have you removed from the courtroom and furthermore if you're going to become agitated during these proceedings, then we'll have this trial without you and I'll have you seated back there. I can't have anybody become agitated and be disrespectful and lose control in the courtroom.

[REMLING]: Your Honor, I am very well in control at this moment and if you were in the position that I'm in, you would be just as agitated.

THE COURT: Sir, you just used a curse word in front of the [c]ourt, in front of me, you just used the F word, right?

[REMLING]: So miniscule.

THE COURT: That's a problem. See, there's another example of why you should allow your attorney to continue to represent you.

[REMLING]: I'll think very carefully as I'm speaking in front of the jury, but I still plan on representing myself because you said my attorney is skilled, that he's, what's the word, it's his profession right, that he's had experience, he's experienced, his experience is doing me no good.

THE COURT: You understand again that you'll be required to abide by the same rules of trial procedure and rules of evidence as an attorney, you understand that?

[REMLING]: Yes.

THE COURT: That you will, failure to make a timely or proper objection waives that error for an appeal, do you understand that?

[REMLING]: No.

THE COURT: Okay, if for example, during closing argument if the prosecutor was to say something that was conceivably objectionable, and you failed to object to that statement, then you waive that for purposes of an appeal, do you understand that?

[REMLING]: Go ahead.

THE COURT: Do you understand that?

[REMLING]: Yeah.

THE COURT: Okay.

[REMLING]: This is so interesting, this is the biggest thing I've

ever done in my life.

THE COURT: And you understand that [your attorney] has a hundred jury trials probably under his belt.

[REMLING]: He explained to me.

THE COURT: And he has the experience and trial strategy and tactics that you do not have.

[REMLING]: Yes.

THE COURT: Okay, and you understand the [c]ourt is advising you it is not in your best interest that you represent yourself at this time?

[REMLING]: I'm looking at losing or losing is basically what you're saying, but what I'm going for is what I'm going for, like I said, his experience is proving no help to me and my inexperience is seeming to be my last resort. I'm a trapped animal, you're backing me into a corner and that's not right. The jury is supposed to be mediators and that's supposed to be where they stand between you, the Judge, and the prosecution and me, they're the ones who are supposed to keep me safe. They're supposed to make me feel safe in here and that's failing because the way that you control this court.

THE COURT: Alright, we'll note your objection. Do you know what you're facing here if convicted on a [L]evel 1 felony?

[REMLING]: Yes[.]

THE COURT: What is that?

[REMLING]: Life.

THE COURT: Okay, a [L]evel 1 felony is punishable up to [forty] years, minimum time [twenty] years, and a fine of up to $10,000, and it has an advisory sentence of [thirty] years, do you understand this?

[REMLING]: Yes.

THE COURT: Okay, and you know you're facing four [L]evel 1 felonies?

[REMLING]: I'm aware.

THE COURT: Okay, and you understand the State may have an argument if you are found guilty that some of those sentences should run consecutively to one another?

[REMLING]: I understand.

THE COURT: Okay.

[REMLING]: Like I said, I'm already losing at this point. This is an unorthodox decision as far as [my attorney] is concerned, he said that to me back in the holding area, I understand it's unorthodox, I understand it's like swinging wild would be the term I would use.

THE COURT: And you understand the [c]ourt's recommending that you not do that?

[REMLING]: I understand.

THE COURT: That if you think you've dug yourself a hole at this point, you're digging it further if you--

[REMLING]: I've not dug myself a hole.

THE COURT: Okay. You know you have the absolute right to be represented by an attorney who has training and experience in criminal law, you understand that?

[REMLING]: Yeah.

THE COURT: And you're still requesting the opportunity to represent yourself?

[REMLING]: I asked you if I could not request another attorney.

THE COURT: No, the answer is no to that.

[REMLING]: So the only other person that could represent me at this point would be myself, right?

THE COURT: Yes, yes.

[REMLING]: Then yes.

* * * *

[REMLING]: Stay on standby, that's, that's what I would say but I'm firm in wanting to represent[] myself at this point. Like I said, his experience has proven no help to me up to this point. I'm fighting for my life and I'll do anything, anything, to protect my freedom.

THE COURT: Mr. Remling, do you suffer from any mental illness?

[REMLING]: I am diagnosed with [A]sperger's syndrome and autism spectrum disorder . . . .

THE COURT: And do you think that mental illness prevents you from representing yourself or understanding the proceedings

that have happened so far?

[REMLING]: No.

THE COURT: Okay.

[REMLING'S ATTORNEY]: And Judge, I could speak to that. I was aware of that diagnosis throughout my representation of Mr. Remling, I'm not a psychologist or a psychiatrist but as part of my job I need to determine whether or not I think a defendant is competent to stand trial, and from the discussions that [Remling] and I have had, as well as his demeanor and his testimony here in court, mixed with the education that he has, I think that he absolutely knows my role, he knows the [c]ourt's role, he knows the prosecutor's role and why we're here, so as far as any competency, I've never had any questions or concern about that. Thank you.

THE COURT: Thank you, and for the record, you do understand what my role is, what I've explained to you my role is, you may not agree with it, but you understand what my role is, correct?

[REMLING]: Yes, you're the [j]udge.

THE COURT: Right, and you understand what the prosecutor's role is, correct?

[REMLING]: Correct.

THE COURT: Okay, and you understood what your attorney was to assist you with during the course of this trial, correct?

[REMLING]: Correct.

THE COURT: And now that you've decided that you want to represent yourself, you understand what your role is now?

[REMLING]: Yeah.

THE COURT: Okay, and you[r] diagnosis would not prevent you from understanding any of that and the proceedings that have been going on during the last two days?

[REMLING]: Your Honor, [A]spberger's syndrome, autism spectrum disorder, it's not a hindrance to my intelligence. I feel that, at a point I'm at a loss for words. Like I said, I'm fighting for my life and you have no idea how hard it is for me at this point. I want to run. I want to fight, not just fight in words, but I'm literally like containing myself trying not to swing on

someone, but you know this is the rest of my life I'm dealing with here.

THE COURT: Well, do you think that you're going to be able to control yourself during closing argument because for you to do that, especially in front of--

[REMLING]: I'll do the best I can, Your Honor.

THE COURT: Especially in front of the jury is a security concern for the [c]ourt, you understand?

[REMLING]: I'm not going to go hog wild, I can control my physical emotions as far as it goes, I do have a problem with my mouth, that is the lack of control I have is primarily with my mouth. I may slip up with a curse word here and there, but--

THE COURT: Well you understand [your attorney] doesn't have a problem with his mouth, he's in full control?

[REMLING]: I understand but I'm only human man.

THE COURT: I understand, but you understand that [your attorney] doesn't have that problem, that impediment and he can say what he needs to say to the jury?

[REMLING]: He's not, it's not what he needs to say, it's what I need to say.

THE COURT: Okay.

[REMLING]: And that's being stopped. There is a blockade being put in my way in what I need to say. Everyone is stopping me from saying what I need to say, and that's, that's hurtful, that really does hurt. The only thing that can help me is the jury hearing me out 100%, no hindrance, no stops, that's what I think would be fair. You said that we've had plenty of time to prepare for a defense, I only told [my attorney] what I need for my defense on Thursday. The prosecution has had over three months, I think that's highly unfair.

* * * *

THE COURT: Alright, we'll show then that [Remling] will be allowed to represent himself, that he's been advised of the perils of self-representation, that he's indicated that his diagnosis does not interfere with his ability to speak or his intelligence, that he understands the proceedings, he understands everyone's role here, and he seems oriented as to time and place.

(Tr. Vol. III, pp. 156-71). The trial court appointed Remling's attorney to act as standby counsel. The trial court directed Remling to be "respectful" while delivering his closing argument; to ensure that his statements are just arguments, "not evidence"; and to "deal with" the trial court's ruling on any objections by the State "just like every other attorney does." (Tr. Vol. III, p. 173).

[24] Thereafter, Remling addressed the jury as follows:

> Ladies and gentlemen of the jury, I ask you to consider, alright the fact of the matter that I'm trying to point out is that there were lies distributed to you on the stand. If someone is willing to lie about something so miniscule, where else can they go with the lie. I understand that the proof is very convincing, but I'm not about to lie to you. It is under the [c]ourt's decision that you not know about certain things and they'll try to object to silence me, that's the whole point to an objection, you stand in the way of my freedom being taken from me.[2] Now, like I said, there's things they don't want you to know due to conflict of interest, my interest is to get the truth out there and I believe you should know. When I was [fourteen] years old I molested my little sister. I feel terrible about it. Unfortunately, that statement there (inaudible) me. Like I said, I'm not about to lie to you. I wanted to get this out sooner, but they wouldn't let me. This is my closing argument to you that this is my life and the reason I'm supporting myself here right now and I got rid of [my attorney] is

---

[2] Prior to testifying on his own behalf, Remling gave the trial court a preview of the information he wanted to share with the jury based on his counsel's expectation that the trial court would rule it irrelevant. The trial court did indeed warn Remling that the majority of his proffered testimony would be deemed irrelevant as it pertained to certain outstanding warrants and his conduct during his police interview, none of which had been presented to the jury during the State's case, as well as conversations that A.S./E.S.'s other sister (who did not testify) had on social media with an individual who was not involved in this case and which had nothing to do with the facts of this case.

because his experience has done me no good. This scares me, right here, and that's exactly the reason why when I was in the interrogation room being questioned by [the detective] that I behaved in what they would call an irrational manner, but could you rationalize it when you're scared and confused, I could. I even tried to attempt suicide on December 11th because I didn't know what to do. On December 12th I managed to get a call out to my mother and she answered the phone, that was one of the short times that I spoke with her while I was incarcerated. I can't even get a letter back any more. I'm surprised honestly that my dad showed up yesterday morning. He took half a day off from work. I think it's wrong that a lot of the things that I want to show you are being withheld from you. You have the right to be informed. I thought I had the right to freedom of speech, but I'm not free to say everything that I want to. I'm not free to show you the lies that have been expelled in this courtroom. And like I said, if the witness is going to lie, what else could be lied about. I mean the simplest matter, we met on Facebook, why couldn't that have been said. I don't think it matters at this point, just the point you know you're not going to believe me because of the evidence, like it said, the burden was on them to prove it. The burden you know a lot of people would consider a burden a load, some weight you know, I'm not even allowed to carry bags. I feel I've been misrepresented by [my attorney] and that's what I sat him to the side. I've wanted to show you a lot more, a lot more, including in my property from the jail I still have a--

* * * *

--picture of my ex-girlfriend . . . holding her son, the son that I wanted to be mine.

* * * *

I even have his name tattooed on my ankle . . . . [I]t has no relevancy but you know the [c]ourt thought that the lies had no relevancy either.

* * * *

Like I said, you know I would believe that the lies show that the witnesses can't be trusted. It would take some doing, but special effects can be convincing too, can't they. I don't know what else

to say, all I know is that this is my last course of action. I'm innocent and I realized a long time ago that the possibility of me winning this is slim to none. I got comfortable with the fact that I could be going to prison for the rest of my life just for trying to defend myself and this didn't go anywhere near what I had imagined when I was planning my defense. I didn't even get to have any of my evidence thrown out there to you. I was really surprised when [E.S.] took the stand and she spat out more lies that I could prove to you if I was allowed to, but I'm not allowed to, it's inadmissible. So, with that, I close my statement.

(Tr. Vol. III, pp. 193-96).

[25] Remling now argues that even though "the record demonstrates that the trial court advised [him] of some of the dangers and pitfalls of proceeding *pro se*, it is clear from the record that Remling did not understand them." (Appellant's Br. p. 21). In particular, Remling points out that "[h]is closing argument was the most prejudicial, damaging evidence against him, and it was he who introduced it. This utter lack of knowledge about the prejudicial nature of this evidence demonstrates that Remling had no appreciation for the pitfalls of self representation." (Appellant's Br. p. 22). Remling further insists that he lacked the experience, education, and understanding of evidentiary rules and courtroom procedure necessary to represent himself. Finally, Remling contends that the trial court "ignored the context of [his] frantic request to proceed *pro se*. In short, Remling was desperate, expressing his belief several times that he was on the verge of being convicted." (Appellant's Br. p. 26). Therefore, Remling demands that this court reverse his conviction and remand for a new trial.

[26] The record in this case establishes that the trial court went to great lengths in advising Remling of the dangers of self-representation. The trial court determined that Remling had achieved his GED and had some college education, and the trial court inquired into Remling's mental state and his understanding of the various roles in the proceeding. Remling assured the court that his Asperger's syndrome was not a hindrance to his intelligence, his ability to understand the proceedings, or his ability to deliver a closing argument. The trial court advised Remling that Remling's attorney was well-versed in the rules of evidence and trial procedure, and that Remling, who had no knowledge of these rules, would be held to the same standard as a licensed attorney. Remling repeatedly indicated his understanding of his obligations and the risks of releasing his experienced counsel. Despite the trial court's warnings and repetitive strong advisements to allow his attorney complete the trial, Remling was adamant in his decision to proceed *pro se* so that he could personally address the jury. The trial court complied with its obligation to warn Remling of the pitfalls of self-representation, and once Remling was armed with this information, the trial court could not prohibit him from exercising his right to represent himself. We find that the trial court's inquiry and Remling's responses were sufficient to establish that Remling made his decision "with eyes open." *Hopper v. State*, 957 N.E.2d 613, 618 (Ind. 2011). In other words, Remling exercised his right to represent himself (and concurrently waived his right to counsel) knowingly, willingly, and voluntarily.

We further note that Remling proceeded *pro se* only to deliver his closing argument. The jury was specifically instructed that "[w]hen the evidence is completed, the attorneys may make final arguments. These final arguments are not evidence. The attorneys are permitted to characterize the evidence, discuss the law and attempt to persuade you to a particular verdict. You may accept or reject those arguments as you see fit." (Appellant's Conf. App. Vol. II, p. 46). The trial court also explicitly instructed Remling that his final statement to the jury was to consist only of argument in an attempt to persuade the jury, but he was not to introduce additional evidence. The fact that Remling did, in fact, ignore the trial court by introducing new and unfavorable information is of no consequence because jurors are presumed to follow properly-given instructions. *R.T. v. State*, 848 N.E.2d 326, 332 (Ind. Ct. App. 2006), *trans. denied*. Furthermore, the overwhelming admissible evidence of guilt against Remling demonstrates that the jury would have convicted him notwithstanding his nonsensical closing argument. Accordingly, we find no basis for reversal.

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly allowed the State to amend the charging Information after trial had commenced, and Remling knowingly, intelligently, and voluntarily waived his right to counsel.

Affirmed.

Robb, J. and Pyle, J. concur