## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 29 2019, 6:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David W. Stone IV
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Derrick Charles Williams,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

August 29, 2019

Court of Appeals Case No.
19A-CR-137

Appeal from the Madison Circuit Court

The Honorable Angela G. Warner Sims, Judge

Trial Court Cause No.
48C01-1810-F6-2501

**Brown, Judge.**

Derrick Charles Williams appeals his convictions for resisting law enforcement as a level 6 felony and driving while suspended as a class A misdemeanor. He raises two issues which we revise and restate as:

I. Whether his decision to represent himself was knowingly and voluntarily made; and

II. Whether the trial court abused its discretion in admitting certain evidence.

We affirm.

## Facts and Procedural History

On September 28, 2018, Edgewood Police Officer Shane Briggs was in full uniform and on patrol in his fully-marked police vehicle when he observed a white pickup truck pull into a driveway. Williams was the truck's driver. Officer Briggs had not seen the truck before, knew that it was a vehicle that did not typically park in that driveway, and knew the person who lived at the home worked out of town. Officer Briggs ran a BMV check of the truck's license plate and learned "there was a protective order for the registered owner of the vehicle, and there was a warrant alert on that vehicle." Transcript Volume I at 217. Officer Briggs parked his vehicle at a nearby church from where he could observe the truck in the driveway and see if the occupant exited the truck. After a short time, he observed the truck back out of the driveway, pause at a place where the officer believed the driver could see his police vehicle, and then continue to enter the road.

[3]     Officer Briggs observed the truck come to a stop at a stop sign and fail to signal prior to turning right, pulled his police vehicle behind the truck to initiate a traffic stop, and activated his overhead lights. Williams did not stop, and Officer Briggs activated his siren for one or two seconds using a couple of different tones to obtain Williams's attention, but Williams did not stop. Williams stopped at a stop sign and then turned left. Officer Briggs followed Williams with his lights and siren activated, and he "cycled through [his] siren tones along with the air horn." *Id*. at 221. He observed that all the other vehicles "were getting out of [the] way." *Id*. at 222. There were multiple places where Williams could have pulled over. Williams drove through a parking lot and parked at a gas station.

[4]     Officer Briggs blocked Williams's truck with his police vehicle, opened his door, drew his weapon, and gave Williams loud verbal commands to shut off the truck, open the door, and show his hands and repeated those commands. Williams did not respond. Meanwhile, Darren Sparks, a former police officer and police chief, observed the pursuit and followed Williams's truck and Officer Briggs to the gas station's parking lot. Sparks looked into the truck, which had tinted windows, and saw that Williams was on a cell phone. Sparks also had his weapon drawn. Anderson Police Officer Brandon Taylor and other officers arrived at the scene. Officer Taylor used his intercom to command Williams to exit the truck, and Williams did not respond. Officers approached the truck, attempted to open a door, and found the door was locked. Officer Briggs used a puncture device to break the driver's window, reached in and unlocked the

door, and opened the door and pulled Williams from the truck. Officers ordered Williams to the ground, he refused and argued with the officers, the officers performed a leg sweep to force him to the ground, and he was handcuffed. Williams refused to identify himself. Officer Briggs located Williams's identification in the truck's center console, and Williams still refused to confirm his identity. Officer Briggs ran a check on Williams, and "dispatch returned with his driver's license that was in suspended, prior status, and he had a warrant . . . for his arrest." *Id.* at 233.

[5]     On October 1, 2018, the State charged Williams with: Count I, resisting law enforcement as a level 6 felony; and Count II, driving while suspended as a class A misdemeanor. The State alleged that Williams was an habitual offender. That same day, the court held an initial hearing. At the start of the hearing, the court asked Williams to state his full name for the record, and Williams replied "I object" and "I won't be going by no names or labels today." Transcript Volume I at 4. The court explained it needed to identify him, and Williams stated "it's Charles DeAndre Gardez," and objected to giving his date of birth. *Id.* The court stated it did not know his grounds for objection, and Williams stated "[t]he grounds for objection is not to be called by no names or no labels" and "you trying to label me." *Id.* at 6. The court found Williams in contempt and that he could purge himself by providing some identifying information.

[6]     On October 15, 2018, the court held another hearing at which Williams appeared and responded to his name. The court read Williams his rights.

When asked if he was able to understand his rights, Williams stated "[n]o." *Id.* at 13. He stated he wanted to know the date and time the charges were filed, the court said that it had not reached that part and needed to know if he understood his rights. Williams stated "I do understand the right . . . to travel and the . . . right to prove my innocence." *Id.* The court asked if he understood that he had a right to a public trial by jury, Williams responded "[n]o," the court noted that Williams had requested a speedy trial and asked "so what right did you think you were invoking when you requested that," and he replied "[t]o prove my innocence." *Id.* at 14. When asked if he understood his right to a speedy trial and trial by jury, Williams replied "[o]kay," and when told he needed to say "yes or no, not okay," he stated "I'm being really coerced into this . . . I really don't understand why I'm going through this process." *Id.* at 14. The court said "if you don't understand, I need you to say, no," and "I'm trying to understand what I can do to help you understand," and Williams replied "Um, release me. I mean . . . ." *Id.* at 14-15.

[7] The court asked "[t]hat will help you understand if I release you," and Williams stated "[y]es, because I've been put in like contempt of court for something, for unjust reasons. I don't even understand why I'm here. I don't even understand the charges. I mean, like, as far as um, the right to travel, I don't understand how I get a driving while suspended. And as far as, I mean, the um, resisting law enforcement, there's an I.C. code, under the I.C. code, . . . it states that I have to been doing twenty (20) miles per hour over the speed limit in order to have that resisting law enforcement uh, with a vehicle. So, I mean, . . . ." *Id.* at

15.  The court explained that it understood that Williams did not agree with the charges and that he would have the right to present his argument at a trial before a jury. Williams asked "what about the right to travel." *Id*. at 16.  The court explained that was an issue for trial.  Williams asked if he was innocent until proven guilty, the court responded affirmatively and noted that it had asked him if he understood that and he had said no, and Williams replied "I don't really because why am I locked up" and "it seems like it's the courts is . . . placing me into guilt." *Id*. at 17-18.  Williams asked about his fast and speedy trial and said "I'd like a date for that." *Id*. at 20.

[8]     The court then noted that an attorney had been appointed to represent him, and Williams said "I don't need no lawyer . . . I can prove my own innocence." *Id*. The court asked if he wanted to represent himself, and Williams said "[y]es, I'd rather prove my own innocence" and "[y]es, of course." *Id*. at 20-21.  The court indicated that it would be asking him some questions so that it could be satisfied that he was capable of representing himself.  Williams said "I object. I'm not a lawyer." *Id*. at 21.  The court responded that it was aware that Williams was not a lawyer.  Upon questioning by the court, Williams indicated that he was not taking any medication or under the influence of any drugs or alcohol.  The court told Williams that he had the right to represent himself or to have counsel represent him and to court-appointed counsel if he could not afford an attorney.  The court informed Williams that, before he made that decision, it wanted him to understand what he was giving up.  The court explained that he may have a number of defenses which an attorney is trained

to know, advised him of the penalties he was facing, and stated there are factors the court can consider in increasing or decreasing his sentence within that range and an attorney would know about the factors. It stated that an attorney has developed skills to present a defense to the charges against him including investigating his case, interrogating witnesses against him, and finding favorable witnesses and obtaining their testimony. It explained that attorneys can explain charges and any lesser included offenses, gather documents and other written evidence, prepare and file motions before the trial such as motions for discovery and to keep unfavorable information from being received as evidence, examine and cross-examine witnesses at trial, present favorable opening and closing statements in jury trials, prepare appropriate written jury instructions and select a jury, and properly preserve the record for purposes of appeal. It also stated that an attorney can evaluate the strengths and weaknesses of a case and give him advice on seeking a plea agreement with the State, that he would not receive any special treatment if he decided not to have an attorney, that he would have to follow all the same rules and procedures, and if it turns out badly he would not be able to complain that he was not an effective attorney in his own defense.

[9] The court said that Williams had the right to decide against having an attorney, but he must be aware that deciding not to have an attorney can turn out to be a very bad decision and that experienced lawyers almost always decide to be represented by another in a criminal case. The court asked what skills or knowledge Williams had that would be helpful in representing himself, and he

replied "[c]ommon sense" and that the State had to have evidence to prove him guilty. *Id*. at 24. When asked if had ever studied criminal law, he said "I'm familiar with it." *Id*. at 25. When asked "have you had other cases that you've represented yourself or been involved with . . . the legal system," Williams replied "[k]ind of," the court asked "[d]id you represent yourself," and he replied "[i]t didn't go that far, I mean, like as far as trial." *Id*. at 26. When asked if any of his cases had gone to jury trial, he replied "[y]es." *Id*. Williams said "I really don't understand what this has to do with . . . ," and the court replied "[t]his has to do with whether or not you're gonna represent yourself," "[t]o make sure you understand the pitfalls and the danger in you representing yourself," and "[a]s long as you understand that, then we're gonna keep moving forward." *Id*. at 26-27. Williams confirmed that he had participated in a jury trial before.

[10] When asked for his highest level of education, Williams answered "[a]gain, I don't understand, but I got my GED, like I said, I've got common sense and I don't understand what these questions have to do with the case." *Id*. at 27. Upon questioning by the court, Williams indicated that he was able to read and write and considered himself to be a good speaker. When asked if he was able to learn the rules of trial procedure and evidence, he replied "not with me being confined at the jailhouse" and said that it had an old computer system and charged two dollars a motion which deterred asking for motions like a motion to suppress. *Id*. at 28. The court asked "[y]ou believe though if you had access you could . . . become familiar with that," and he replied "[o]f course I could."

*Id*. at 29. When asked if anyone had told him, "if you don't have an attorney, then you'll get a lighter sentence or receive[d] special treatment," he replied "[n]o, I've been threatened. I've [sic] under duress and I've been coerced that if I don't have an attorney that I'm liable to get . . . canned." *Id*. When asked if anyone was telling him that he should have an attorney "and you think that is threatening you," Williams answered "[n]o, the courts, you just said that." *Id*. at 29-30. The court told Williams "I do think you should have an attorney. But, you get to make that choice," it asked "[d]o you still wish to proceed without counsel," and Williams replied "[y]es." *Id*. at 30. The court permitted Williams to represent himself. Williams filed a motion to suppress, which the court denied after a hearing.

[11] At the jury trial, the State presented the testimony of Officer Briggs, Officer Taylor, and Sparks. Officer Briggs testified that he observed the white pickup truck pull into a driveway and believed the vehicle was suspicious. He testified that he ran a BMV check of the license plate, at which point Williams stated "I object" and the court overruled the objection. *Id*. at 216. Officer Briggs testified that the results indicated that there was a protective order for the registered owner of the vehicle and there was a warrant alert on the vehicle. At that point, Williams objected, and the court overruled the objection. Officer Briggs testified: "I watched the vehicle back out of the driveway . . . . [W]hen he was backing out of the driveway, he stopped about the time where I believe the driver would have seen my car parked. And he paused in the, in the roadway, half in the roadway and half in the driveway, and then continued

after a moment . . . ." *Id*. at 218. Officer Briggs testified regarding his attempt to stop Williams by activating his vehicle's lights and siren and how Williams failed to stop his truck.

[12] Officer Briggs testified that, at the gas station, he blocked Williams's truck, opened his door, drew his weapon, and gave loud commands to shut the truck off, open the door, and show his hands. The prosecutor asked "why did you draw your service weapon," Officer Briggs answered "[a]fter the vehicle had fled for that amount of time, with a slow speed pursuit like that, we are trained that that may be time for the driver to either call friends for an ambush . . . ," at which point Williams objected and the court overruled the objection, and Officer Briggs continued "[s]et up a possible escape, a possible ambush or possibly come up with some . . . plan to attach [sic] the officer. And that . . . comes from all of our stops training and . . . other . . . patrol training." *Id*. at 225-226. Williams again objected and stated "[s]peculation," and the court overruled the objection. *Id*. at 226. When asked "in your training, you've been taught that those are possibilities," Officer Briggs answered "[a]bsolutely," and when asked, "in your experience and [] seeing other officers . . . [h]ave you seen that happen," he replied "[t]hat does happen." *Id*. at 226-227. Officer Briggs testified that, after obtaining Williams's identification, he ran a check on him and learned that his driver's license was suspended and that there was a warrant for his arrest. Williams objected, and the court overruled the objection. On cross-examination, Williams asked Officer Briggs "[d]id you say you was under threat . . . [o]f the vehicle being turned on and backing out," he answered, "[w]e

consider everything from a fleeing suspect, so we will call it [a] threat until proven otherwise. That's what our training does. Through my experience, anything in that vehicle, all unknowns are a threat to me." Transcript Volume II at 5-6.

[13] Officer Taylor testified that he had his service weapon drawn as he was giving commands for Williams to exit his truck because he did not know if he had a weapon or something that could hurt him. When asked if he had training based on low-speed pursuits, Officer Taylor replied affirmatively, and when asked "what does that training tell you to do after there's been a low speed pursuit," he answered "[j]ust the same thing as a high speed pursuit. Take the same precautions [], not knowing the subject had a weapon or something like that, just more protect ourselves from the public." *Id*. at 26. Sparks testified that he noticed that Officer Briggs did not have any backup, "the officers don't know what's going on at that point," and "[t]here's usually a reason why someone doesn't stop immediately." *Id*. at 63. He testified, "[u]sually, a suspect is formulating a plan," "[t]hey're doing something," "they're trying to either figure a way out, they're gonna run or they're formulating a plan maybe to even do something to the officer," "[t]here wasn't any officers there to back this officer up," "I still carry a handgun as a retired policeman," "at that point [] my concern was if I just drove off, what could happen to this officer," and "[a] lot of police officers are being ambushed and, literally, what came into my mind was [] this going to be an ambush, [] because of where the suspect stopped his vehicle." *Id*. at 64. The jury found Williams guilty on Counts I and II and that

he was an habitual offender. The court sentenced Williams to concurrent terms of two years on Count I, which was enhanced by three years for being an habitual offender, and one year on Count II.

## *Discussion*

### I.

The first issue is whether Williams made a knowing, voluntary, and intelligent waiver of his right to counsel. Williams argues that his bizarre responses, repeated statements that he was under duress, coercion, and threat, and multiple statements that he did not understand show that his decision to proceed *pro se* was not intelligently and knowingly made. He also argues that he was not mentally competent to elect to represent himself. The State responds that the dialogue between the court and Williams indicates that his decision to proceed *pro se* was made knowingly, voluntarily, and intelligently. It argues that the court thoroughly explained the dangers of self-representation, inquired into Williams's background, and contrasted for Williams what an attorney could do that he might not be able to do for himself and that Williams does not establish that he was incompetent to decide to represent himself.

The Sixth Amendment, applicable to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to counsel before he may be tried, convicted, and punished. *Hopper v. State*, 957 N.E.2d 613, 617 (Ind. 2011). This protection also encompasses an affirmative right for a defendant to represent himself in a criminal case. *Id*. When a criminal defendant waives his right to counsel and elects to proceed *pro se*, we must

decide whether the trial court properly determined that the defendant's waiver was knowing, intelligent, and voluntary. *Jones v. State*, 783 N.E.2d 1132, 1138 (Ind. 2003). Waiver of assistance of counsel may be established based upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *Id.* There are no prescribed "talking points" the court is required to include in its advisement to the defendant; it need only come to a considered determination that the defendant is making a voluntary, knowing, and intelligent waiver. *Poynter v. State*, 749 N.E.2d 1122, 1126 (Ind. 2001). The defendant should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open. *Leonard v. State*, 579 N.E.2d 1294, 1295 (Ind. 1991).

[16] In reviewing the adequacy of a waiver, we consider four factors: (1) the extent of the court's inquiry into the defendant's decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed *pro se*. *Kubsch v. State*, 866 N.E.2d 726, 736 (Ind. 2007), *reh'g denied*, *cert. denied*, 553 U.S. 1067, 128 S. Ct. 2501 (2008). The trial court is in the best position to assess whether a defendant has knowingly and intelligently waived counsel. *See Poynter*, 749 N.E.2d at 1128 (citation omitted). Under the fourth factor, the court considers whether the defendant's decision appears tactical or strategic in nature or seems manipulative and intending delay, inferring knowledge of the

system and understanding of the risk and complexities of trial from more deliberative conduct. *Id.* at 1128 n.6. We will most likely uphold the trial judge's decision to honor or deny the defendant's request to represent himself where the judge has made the proper inquiries and conveyed the proper information, and reaches a reasoned conclusion about the defendant's understanding of his rights and voluntariness of his decision. *See id.* (citation omitted).

[17] The record reveals that the trial court engaged in an extensive colloquy with Williams regarding the dangers and disadvantages of self-representation. The court set forth in detail the possible disadvantages of Williams representing himself. The court asked Williams about his education, his ability to read, write, and speak, his skills and training, his ability to learn the rules of procedure and evidence, and his prior experience in the legal system and with jury trials. While Williams stated several times that he did not understand or was being coerced, the statements related to his confinement pending trial, his disagreement with the charges against him, and the court's statements that it believed he should have an attorney. The exchange between the court and Williams shows that he understood that the court believed that he should be represented by counsel and may be disadvantaged by not having an attorney. The trial court did not make any indication that Williams demonstrated a level

of mental illness which prevented him from representing himself.[1]  The trial court was in a position to observe Williams's demeanor, the extent to which he was recalcitrant or stated he did not understand or was coerced, his behavior, his statements regarding his understanding of the charges against him and the proceedings, and his responses and to assess his experience, whether he understood the disadvantages of self-representation, and the extent to which his decision and responses were tactical.  Williams was adamant that he represent himself when the court first raised the issue of representation and maintained his position throughout the extensive exchange regarding his ability to represent himself and the possible disadvantages of doing so.  We conclude that the trial court's inquiry and Williams's responses were sufficient to establish that he made his decision to represent himself knowingly, voluntarily, and intelligently.

## II.

---

[1] Williams cites *Sturdivant v. State*, 61 N.E.3d 1219 (Ind. Ct. App. 2016), *trans. denied*.  In that case, the defendant argued the trial court should have found her to be severely mentally ill based on her bizarre statements as well as incorrect and unusual legal arguments.  61 N.E.3d at 1224.  At trial, the defendant made a number of puzzling legal arguments, asked many puzzling questions of witnesses, and informed a testifying officer that treason is punishable by death.  *Id*. at 1225.  We found that, while some of the defendant's statements were undeniably strange and that she clearly lacked the legal skills of an experienced criminal defense attorney, there was no evidence the defendant had been evaluated by a mental health professional or been diagnosed with a mental illness and that, to the extent there were some indicators of mental illness, they were not sufficient to outweigh the defendant's explicit and repeated requests to waive counsel and represent herself.  *Id*.  We emphasized that trial courts are in the best position to assess the competency of criminal defendants and the knowingness of waivers of the right to counsel, that the court had numerous opportunities to converse with and observe the defendant, and that the court's decision was not clearly erroneous.  *Id*. at 1226.  *Sturdivant* does not require that we find Williams suffered from a mental illness which prevented him from representing himself.  To the extent there may have been some indicators of mental illness, they were not sufficient to outweigh Williams's explicit and repeated requests to waive counsel and represent himself.

[18]  The next issue is whether the trial court abused its discretion in admitting certain evidence. The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). A trial court's ruling on the admission of evidence is generally accorded a great deal of deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*. We do not reweigh the evidence; rather, we consider only evidence that is either favorable to the ruling or unrefuted and favorable to the defendant. *Beasley v. State*, 46 N.E.3d 1232, 1235 (Ind. 2016). We will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). In determining the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact finder. *Id.* at 1059. An improper admission is harmless if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.*

[19]  Williams first asserts that the trial court should not have allowed the State to elicit testimony regarding the possibility of police being ambushed and argues the concern of police ambushes was highly inflammatory and was not a fact of any consequence in determining whether he had resisted law enforcement or was driving with a suspended license. The State responds that Williams objected at trial on the basis of speculation and that the officers were not required to speculate about their training regarding how to respond as a matter of course to a slow-speed pursuit of a suspect who refuses to pull over. It also

argues that the challenged testimony simply recounted standard safeguarding techniques and did not result in an unfair trial.

[20] Ind. Evidence Rule 401 provides that evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Ind. Evidence Rule 403 provides that the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.

[21] The record reveals that Officer Briggs, Officer Taylor, and Sparks testified regarding the possible dangers following a slow-speed pursuit based on their training and experience. The officers testified that these possible dangers were the reason they drew their weapons, and Sparks testified as to his concerns and why he remained at the scene. We cannot say the prosecutor's questions called for speculation. Moreover, the evidence establishes that, after Officer Briggs activated his police vehicle's lights and siren to initiate the stop, Williams did not stop his vehicle for multiple blocks. After Williams stopped at a gas station, law enforcement blocked his vehicle and issued loud commands for Williams to exit his truck which had tinted windows, drew their weapons, and ultimately punctured the truck's window in order to remove Williams. The testimony regarding the officers' training and use of caution was minimal relative to all of the testimony and evidence presented to the jury and did not substantially affect Williams's rights. There is no substantial likelihood that the challenged

testimony contributed to the convictions, and any alleged error in its admission does not warrant reversal.

[22] Williams further argues that the court should not have permitted the State to introduce evidence of a warrant and cites Ind. Evidence Rule 404(b). The State responds that the evidence was admissible to show motive, plan, or knowledge and that its admission is at most harmless as the evidence of his guilt was overwhelming.

[23] Ind. Trial Rule 404(b) provides that evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. Rule 404(b)(2) provides that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The standard for assessing the admissibility of Rule 404(b) evidence is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Whatley v. State*, 908 N.E.2d 276, 281 (Ind. Ct. App. 2009), *trans. denied*. The evidence is inadmissible when the State offers it only to produce the "forbidden inference" that the defendant has engaged in other, uncharged misconduct and the charged conduct was in conformity with the uncharged misconduct. *Id*. The court has wide latitude in weighing the probative value of the evidence against the possible prejudice of its admission.

*Id.* If evidence has some purpose besides behavior in conformity with a character trait and the balancing test is favorable, the court can elect to admit the evidence. *Id.* For instance, evidence which is necessary for the jury to understand the relationships between the victim, various witnesses, and the defendant may be admissible. *Id.*

[24] Officer Briggs testified that he watched Williams's vehicle back out of a driveway, that "when he was backing out of the driveway, he stopped about the time where I believe the driver would have seen my car parked," and "he paused in the, in the roadway, half in the roadway and half in the driveway, and then continued after a moment." Transcript Volume I at 218. Williams did not stop for multiple blocks while Officer Briggs followed him with his overhead lights and siren activated and did not exit his truck when commanded to do so. The jury heard from multiple eyewitnesses. The challenged evidence was admissible to show motive, intent, plan, or absence of mistake. We cannot say that the evidence violated Evidence Rule 404(b) or that its probative value was substantially outweighed by the danger of unfair prejudice. Even assuming evidence of a warrant was inadmissible, in light of the overall strength of the State's case and the context of the challenged evidence, we conclude that the probable impact on the jury was minimal and that reversal is not required.

[25] For the foregoing reasons, we affirm Williams's convictions.

[26] Affirmed.

Altice, J., and Tavitas, J., concur.